# In the United States Court of Federal Claims

BITSCOPIC, INC.,

        Plaintiff,

        v.

THE UNITED STATES,

        Defendant,

        and

DOCUMENT STORAGE SYSTEMS, INC.,

        Intervenor-Defendant.

No. 23-cv-94

Filed: June 28, 2023

Publication: July 5, 2023[1]

*Jeffery M. Chiow*, Greenberg Traurig, LLP, Washington, D.C. argued for Plaintiff.  With him on the briefs are *Eleanor Ross*, *Christopher O'Brien*, and *Michael Pusateri*, Greenberg Traurig, LLP, Washington, D.C.

*Evan Wisser*, United States Department of Justice, Civil Division, Washington, D.C. argued for Defendant.  With him on the briefs are *Brian M. Boynton*, Principal Deputy Assistant Attorney General; *Patricia M. McCarthy*, Director, Commercial Litigation; *Tara K. Hogan*, Assistant Director, Commercial Litigation; and *Natica Chapman Neely*, Department of Veterans Affairs, Office of General Counsel.

*Joshua A. Mullen*, Womble Bond Dickinson (US) LLP, Washington, D.C. argued for Intervenor-Defendant.  With him on the briefs are *Joshua R. Funderburke* and *Christopher L. Lockwood*, Womble Bond Dickinson (US) LLP, Nashville, TN.

---

[1] This Memorandum and Order was filed under seal in accordance with the Protective Order entered in this case (ECF No. 32) and was publicly reissued after the parties indicated redactions were not necessary.  *See* Notice (ECF No. 112).  The sealed and public versions of this Memorandum and Order are otherwise identical, except for the publication date and this footnote.

## MEMORANDUM AND ORDER

The United States Department of Veterans Affairs (VA) serves our Nation's veterans.  One of the most important services the VA provides is veteran health care.  The Veterans Health Administration (VHA), a component of the VA, "provide[s] a complete medical and hospital service for the medical care and treatment of veterans."  38 U.S.C. § 7301(b).  The VHA "is the largest integrated health care system in the United States," with approximately 1,300 facilities serving over 9 million veterans.[2]  The VHA consists of 18 regional systems of healthcare facilities called Veterans Integrated Services Networks (VISN(s)).  VISN 20, the network at issue here, provides health care to veterans in the Pacific Northwest, including Alaska, Washington, Oregon, and parts of Idaho, Montana, and California.  *See* Plaintiff's Second Amended Complaint (ECF No. 52) (2d Am. Compl.) Ex. O (SOW).  VISN 20's eight healthcare facilities serve approximately 333,000 veterans each year.  *See id.*; *see also* Defendant's Cross-Motion to Dismiss (ECF No. 58) (Def. Cross-Mot.) at 13.[3]

This bid protest concerns VISN 20's procurement of clinical surveillance software. Clinical surveillance software "continuously monitors hospital and patient data to improve patient health and outcomes."  Def. Cross-Mot. at 13.  Four facilities in VISN 20 currently use TheraDoc, a clinical surveillance software developed by Intervenor-Defendant Document Storage Systems, Inc. (DSS).  *See* Declaration of Michael McDonald, Service Chief of Healthcare Technology Management for VISN 20 (ECF No. 58-1) (McDonald Decl.) ¶ 10.  Plaintiff Bitscopic, Inc., which

---

[2] *About VHA*, U.S. Dep't of Veterans Affs., https://www.va.gov/health/aboutVHA.asp (last visited April 17, 2023).

[3] Citations throughout this Memorandum and Order reference the ECF-assigned page numbers, which do not always correspond to the pagination within the document.

develops a competing software called PraediAlert,[4] protests the VA's procurement of clinical surveillance software in VISN 20 and elsewhere.  *See* 2d Am. Compl. at 1.  Though the VA's procurement activities in VISN 20 were the impetus behind Bitscopic's protest, Bitscopic's challenge is broader.  Bitscopic asks this Court to enjoin the VA from procuring TheraDoc under any circumstance, at any time, in any VISN.  *See* 2d Am. Compl. at 34–35; *see also* Plaintiff's Second Revised Motion for a Preliminary Injunction (ECF No. 53) (PI Mot.) at 1–3, 46.

Four motions are pending before this Court.  The first motion is Bitscopic's Second Revised Motion for a Preliminary Injunction.  *See* PI Mot.  The second and third motions are the Government's and DSS's respective motions to dismiss under the Rules of the United States Court of Federal Claims (Rule(s)) 12(b)(1) and 12(b)(6).  *See* Def. Cross-Mot; Intervenor-Defendant's Cross-Motion to Dismiss (ECF No. 59) (Int. Cross-Mot.).  The fourth motion is the Government's Motion to Remand.  *See* Defendant's Opposed Motion for Voluntary Remand (ECF No. 82) (Remand Mot.).  The motions are fully briefed, and this Court conducted oral argument on April 24, 2023.  Transcript of April 24, 2023 Oral Argument (ECF No. 89) (Oral Arg. Tr.).  Having considered the parties' arguments and applicable law, this Court **GRANTS** Defendant's and Intervenor-Defendant's Cross-Motions to Dismiss (ECF Nos. 58, 59) and **DENIES** as moot Plaintiff's Second Revised Motion for a Preliminary Injunction (ECF No. 53).  This Court also **DENIES** as moot Defendant's Opposed Motion for Voluntary Remand (ECF No. 82).

---

[4] Bitscopic appears to alternate the spelling of its clinical surveillance software.  Sometimes Bitscopic uses "PraediAlert."  *See, e.g.*, 2d Am. Compl. ¶ 15; Declaration of Bill Maher, Director of Sales and Business Development at Bitscopic (ECF No. 23-1) (1st Maher Decl.) ¶¶ 2, 7.  Other times, Bitscopic uses "PraedAlert."  *See, e.g.*, 2d Am. Compl., Ex. N (ECF No. 52-1).  Indeed, Bitscopic's own "Capability Statement" uses "PraediAlert" and "PraedAlert" interchangeably.  *Id.* For the purposes of this case, the inconsistent spelling is irrelevant.  This Court therefore references Bitscopic's clinical surveillance software as "PraediAlert."

## BACKGROUND

I.     **Clinical Surveillance Software**

Clinical surveillance software is used by hospitals to monitor patients. PraediAlert, for instance, "helps track patient care and fight the spread of infection by accessing data and analytics, identifying early intervention opportunities, and generating custom reports." 2d Am. Compl. ¶ 15. There are three clinical surveillance software products approved for use in VA facilities, two of which are relevant here: Bitscopic's system, PraediAlert, and DSS's system, TheraDoc. *See* Def. Cross-Mot. at 14. Bitscopic and DSS sell their products to the VA directly or through intermediary resellers; none of these resellers is a party to the present action. *See* 2d Am. Compl. ¶¶ 1, 6; Def. Cross-Mot. at 39.

According to Defendant, the clinical surveillance software in VISN 20 serves three important purposes. McDonald Decl. ¶ 4. First, it "provides real-time monitoring of antibiotic usage among all patients." *Id.* ¶ 5. Antibiotic tracking is important to "reduce the risk of antibiotic-resistant infections" and comply with accreditation requirements surrounding antibiotic administration. *Id.* Second, clinical surveillance software "provides real-time monitoring and reporting of medications and lab reports," which helps "to promptly identify and address any emerging health conditions or complications in patients." *Id.* ¶ 6. Third, clinical surveillance software "identifies and mitigates the risk of infectious diseases that may be present within the hospital or the surrounding community." *Id.* ¶ 7. The software can, for example, monitor if any patients contract COVID-19 and alert hospital staff so they may implement appropriate measures to limit further spread of the virus. *Id.*

II.        **Bitscopic's Original Complaint**

In January 2023, the VA issued a Special Notice for "TheraDoc Software Contract Support and Maintenance" in VISN 20.  *See* Complaint (ECF No. 1) (Compl.) Ex. F (ECF No. 1-1 at 63); *see also* 2d Am. Compl. Ex. F.   The Special Notice announced the VA's intent to purchase TheraDoc maintenance and support for VISN 20 "from a single source."  2d Am. Compl. Ex. F. The ostensible "single source" was DSS, which "has sole proprietary rights for servicing the TheraDoc clinical decision support tool."  *Id.*

Shortly after the Special Notice issued, on January 17, 2023, Bitscopic contacted the relevant VA point of contact to inquire about the Special Notice.  *See* 2d Am. Compl. Ex. E. Bitscopic noted "the license for Thera[D]oc software" in VISN 20 "expires on March 31, 2023." *Id.*; *see also* 2d Am. Compl. Ex. J.  The Special Notice was limited to "support and maintenance" for TheraDoc, rather than a license to the TheraDoc software, so VISN 20's plan after its TheraDoc license expired on March 31 was seemingly not set.  Bitscopic queried whether VISN 20 had plans to solicit a new license for clinical surveillance software.  2d Am. Compl. Ex. E.  The VISN 20 Contracting Specialist responded that VISN 20 would be "sole sourcing to the OEM for all of it." *Id.*  The "OEM" is the Original Equipment Manufacturer, DSS.   Based on the Contracting Specialist's representation, Bitscopic viewed the Special Notice as VISN 20's attempt to procure a TheraDoc license from DSS without issuing a solicitation for competitive bids.  *See* Compl. ¶ 11.

Bitscopic initiated its bid protest on January 25, 2023.  *See* Compl.  Bitscopic characterized its protest as simply the latest in a string of confrontations regarding the VA's allegedly unlawful procurements of clinical surveillance software.   According to the Complaint, Bitscopic "has protested at least ten attempts by the VA to make improper sole-source or brand-name awards of [] TheraDoc."  Compl. ¶ 7.  Some of these protests resulted in corrective action, and some resulted

in the VA selecting Bitscopic's product "over TheraDoc." *Id.*

Bitscopic's Complaint generally protested "the decision of the [VA] to issue a brand-name procurement for [DSS's] commercial-off-the-shelf clinical surveillance software known as TheraDoc." Compl. at 1. Count I of the Complaint alleged the proposed sole-source procurement in VISN 20, announced in the Special Notice, was unjustified, arbitrary, and capricious. *See* Compl. ¶¶ 12–25. Count II of the Complaint further alleged the VA's "procurements of clinical surveillance software generally," including the proposed sole-source procurement in VISN 20, violate the VA's statutory and regulatory obligations. *See* Compl. ¶ 27; *see generally id.* ¶¶ 26–37.

Bitscopic also filed a motion for a preliminary injunction. *See* Plaintiff's Motion for Preliminary Injunction (ECF No. 7). Bitscopic requested this Court "enjoin the [VA] from proceeding with the brand-name, sole-source procurement of TheraDoc software announced in [the] Special Notice." *Id.* at 2. Bitscopic also asked this Court to "enjoin the [VA] from proceeding with any procurement of TheraDoc software." *Id.*

The parties filed a Joint Status Report on January 30, 2023. *See* Joint Status Report (ECF No. 12). The Government expressed its intention to move to dismiss Count II for lack of subject matter jurisdiction. *Id.* at 3. The parties also jointly proposed that Bitscopic would file a First Amended Complaint and a Revised Motion for a Preliminary Injunction. *Id.* The Government would then respond with a Cross-Motion to Dismiss. *Id.* This Court adopted the parties' proposed schedule. *See* Scheduling Order (ECF No. 18).

### III.     The Government's Motion to Dismiss or, Alternatively, to Stay

On February 2, 2023, the day before Bitscopic was scheduled to file its First Amended Complaint and Revised Motion for a Preliminary Injunction, the Government unexpectedly filed

a Motion to Dismiss in Part or, Alternatively, Stay in Part.[5]  *See* Defendant's Motion to Dismiss or Stay (Stay Mot.) (ECF No. 21).  The Government moved to "dismiss Count I of the complaint as unripe."  *Id.* at 1.  Alternatively, the Government moved the Court to "stay all proceedings related to Count I."  *Id.*

The Government alleged it had received new information demonstrating that, "at the moment, there is no active procurement as described in Count I of Bitscopic's complaint."  Stay Mot. at 1.  Count I had focused on alleged defects in the Special Notice that had purportedly announced VISN 20's proposed sole-source procurement of TheraDoc.  *See* Compl. ¶¶ 12–25.  In its Motion to Dismiss or Stay, the Government contended, for the first time, that "there is no procurement associated with" the Special Notice, and that the Special Notice was apparently "published in error."  Stay Mot. at 2.  The Government emphasized in its Motion that "[n]othing

---

[5] When the Government filed its Motion to Dismiss or Stay on February 2, 2023, Bitscopic's original Complaint (ECF No. 1) was the active complaint.  On February 3, 2023, Bitscopic filed its First Amended Complaint (ECF No. 22), which primarily added a Count III to its original complaint.  The Government's Motion to Dismiss or Stay, filed on February 2, was thus arguably mooted by the filing of a new amended complaint on February 3.  Despite this, and for litigant and judicial efficiency purposes, the parties confirmed there was "no dispute that Defendant moves to dismiss or, alternatively, moves to stay Count I of Plaintiff's first amended complaint."  Transcript of February 14 Status Conference (ECF No. 61) (Feb. 14 Tr.) at 7:16–18.  Several facts supported that conclusion.  First, there was no dispute that Count I of the First Amended Complaint was "substantively identical" to Count I of the original Complaint.  *Id.* at 6:23–7:7.  The issues and requested relief regarding Count I were the same in both complaints; the First Amended Complaint had primarily added a Count III to its original complaint.  *Id.*  The Government's arguments for dismissal of the original Complaint were therefore "equally applicable" to the First Amended Complaint.  *Id.* at 7:5–7.  Second, subsequent briefing confirmed the parties' understanding and acknowledgements that the Government had moved to dismiss Count I of Bitscopic's First Amended Complaint.  Bitscopic's opposition to the Government's Motion to Dismiss or Stay (ECF No. 24) and the Government's reply in support (ECF No. 26) both cited the First Amended Complaint "as the relevant pleading."  *Id.* at 7:8–18.

In summary, all parties agree that the Government's Motion to Dismiss or Stay Count I related to the claims set forth in Bitscopic's First Amended Complaint (ECF No. 22), which were indistinguishable from the claims alleged in Count I of its original complaint.

about [the Special Notice] has any relationship to VA's future efforts to acquire clinical surveillance software." *Id.* The Government also cautioned, however, that the "VA does intend to acquire clinical surveillance software" for VISN 20. Stay Mot. at 2. VISN 20's current TheraDoc license was set to expire on March 31, 2023, and beginning April 1, 2023, VISN 20 would need a new license, for either TheraDoc or another clinical surveillance software product. *Id.* The Government explained the VA was assessing its needs in VISN 20 and whether the VA "can lawfully consider TheraDoc as part of that upcoming solicitation." *Id.* According to the schedule provided by the Government, the VA would finalize its Performance Work Statement (PWS) — thereby deciding whether VISN 20 required TheraDoc — by February 16, 2023. *Id.* But as of February 2, the Government claimed that the VA "ha[d] made no final decisions that would permit this Court to review the issues presented in Count I." *Id.* at 3. Therefore, according to the Government, Count I was not ripe for judicial review and should be dismissed or stayed until the VA issued a final decision regarding the VISN 20 procurement. *Id.* at 2–4.

This Court held a status conference with the parties on February 8, 2023. *See* Transcript of February 8 Status Conference (ECF No. 39) (Feb. 8 Tr.). During the status conference, the Government confirmed February 16, 2023 "is the date [by] which VA contends to complete its analysis as to whether it requires TheraDoc specific brand name procurement or whether it can use any clinical surveillance technology." *Id.* at 8:5–11; *see also id.* at 9:1–7 (Government counsel confirming "[t]he scope of work will be issued on February 16, and that will include the information as to VA's determination about whether it is going to pursue a brand name only procurement for just TheraDoc"); *id.* at 30:25–31:5 (Government counsel confirming "[w]e will know as of February 16 . . . if [the VA] has determined yes, it needs TheraDoc the brand or it needs any general clinical surveillance software"). Therefore, by February 16, 2023, the VA would know

(i) whether it needed TheraDoc and would issue a brand-name solicitation — at which point Bitscopic's challenge would be ripe — or (ii) whether the VA would issue a solicitation for a competitive procurement — at which point Bitscopic's challenge would be moot, assuming PraediAlert was eligible under the competitive solicitation.

Despite the Government's representation that it had issued the Special Notice in error, the Government confirmed at the February 8, 2023 status conference that it had not yet withdrawn the Special Notice, which was still active and publicly posted.  *See* Feb. 8 Tr. at 4:8–10 (Government counsel confirming the Special Notice "has not been . . . formal[ly] withdraw[n] at the moment").  This Court therefore requested a declaration from a VA representative confirming the Special Notice was issued in error or was otherwise not related to an active procurement in VISN 20.  *See id.* at 28:10–25.  The Government subsequently filed a declaration from Sandra Snediker, Contracting Officer and a Branch Chief for the VA, Network Contracting Office 20.  *See* Declaration of Sandra Snediker (ECF No. 35-1) (Snediker Decl.).  Ms. Snediker confirmed the Special Notice was "prematurely issued."  *Id.* ¶ 5.  She further averred that the VA had formally withdrawn the Special Notice, and she attached the cancellation notice to her declaration.  *Id.* ¶ 8; *see id.* at 3–6.  Considering Ms. Snediker's declaration, Bitscopic agreed that a stay would be appropriate.  *See* Plaintiff's Response to Defendant's Declaration (ECF No. 40) at 2 ("Bitscopic requests that the Court not dismiss Count I, but rather stay proceedings . . . .").

On February 14, 2023, this Court granted in part Defendant's "Motion to Dismiss in Part or, Alternatively, Stay in Part," and briefly stayed all proceedings relating to Plaintiff's First Amended Complaint.  *See* Order (ECF No. 41); *see also* Feb. 14 Tr.  Based on the parties' filings and acknowledgments, this Court concluded that Bitscopic's "challenge to an anticipated procurement [in VISN 20], where the requisite facts [were] still unfolding and the terms and

justifications of the prospective solicitation [were] not known, [was] not ripe for judicial review." Feb. 14. Tr. at 13:22–14:1. The Government, however, had presented this Court with a timeline reflecting that the VA expected to issue its PWS for the VISN 20 procurement by February 16, 2023 — only two days after the Court's decision. *Id.* at 14:20–24. Thus, the PWS, expected to be issued in two days, would establish "whether the VA intend[ed] to sole source a brand name product in favor of TheraDoc." *Id.* at 15:1–3. Accordingly, if the VA decided to seek a sole-source brand-name procurement, Count I of Plaintiff's First Amended Complaint would quickly "ripen based on the agency's decision . . . to exclude [Bitscopic] from consideration." *Id.* at 15:3–6. Therefore, though Bitscopic's Count I was unripe as of February 14, it was evident, based on the Government's statements to this Court, that all parties would know within days whether Count I would ripen. *See generally id.* at 15:1–16:4. In light of this representation by the Government, and for judicial and party efficiency purposes, this Court opted to stay, rather than dismiss, all proceedings related to Count I pending the Government's issuance of the PWS. *Id.* at 15:25–16:4.

This Court also granted the Government's Motion to Stay and further exercised its discretion to stay the remaining counts — Counts II and III — of Bitscopic's First Amended Complaint as well. As there was "substantive overlap" between Counts I, II, and III, the Court held it would be "inefficient, unnecessary, and unduly burdensome for the Court or the parties to address similar parts of the first amended complaint . . . in a piecemeal manner." Feb. 14. Tr. at 16:24–17:3. The Government was ordered to inform the Court by February 20, 2023, "regarding the PWS and the VA's decision concerning the method by which it will procure clinical surveillance software for VISN 20." *Id.* at 17:16–21.

**IV.**      <u>**The VA's Finalized Procurement in VISN 20**</u>

When February 20 arrived, the Government informed the Court that "the draft PWS [was] still undergoing review within [the] VA." Defendant's Status Report (ECF No. 42). The Government requested a short extension, which this Court granted. *Id.*; *see* Minute Order dated Feb. 20, 2023. The Government subsequently requested two additional, short extensions of time. Defendant's Status Reports (ECF Nos. 43, 44). The Government cited "interagency discussions" and a thorough review of the draft Statement of Work as the source of the delay. *Id.* This Court granted the Government's requests but warned "[n]o further extensions" beyond March 2, 2023, would "be granted absent extraordinary cause." Minute Orders dated Feb. 23 and Feb. 28, 2023.

On March 2, 2023, the Government filed a Status Report stating the VA had "finalized the statement of work for the VISN-20 clinical surveillance software procurement." Defendant's Status Report (ECF No. 47) at 1. The VA had "determined that it requires TheraDoc for this procurement" and "executed a justification to support its brand name requirement." *Id.* The Government further reported that the VA intended to "issue a request for quote (RFQ) through the (NASA) Solutions for Enterprise-Wide Procurement (SEWP) V Government Wide Acquisition Contract." *Id.* The procurement would then "result in a task order award under one of the existing SEWP V contracts."[6] *Id.*

The VA's planned procurement in VISN 20 was encapsulated in two documents. The first document was the VISN 20 Statement of Work (VISN 20 SOW). *See* 2d Am. Compl. Ex. O (ECF No. 52-1 at 99). The VISN 20 SOW explained that "TheraDoc is currently installed and utilized"

---

[6] It is undisputed that Bitscopic did not hold a NASA SEWP V contract and was therefore ineligible to bid on the proposed task order. *See* Def. Cross-Mot. at 16–17, 20; Plaintiff's Reply in Support of its Motion for a Preliminary Injunction and Response to Motions to Dismiss (ECF No. 64) (Pl. Resp.) at 11; Oral Arg. Tr. at 152:20–153:4.

by four of VISN 20's eight health care facilities: "VA Alaska Healthcare System, VA Boise Healthcare System, VA Portland Healthcare System, and VA Puget Sound Healthcare System." *Id.* The planned procurement was therefore "for software licenses, software maintenance and technical support for the *continued use* of TheraDoc" in those four facilities. *Id.* (emphasis added). The VISN 20 SOW specified that the VA "intends to competitively award a single Delivery Order with Options off of NASA IT GWAC-SEWP to a firm capable of providing TheraDoc licenses, software maintenance, training, and technical support." *Id.* Two authorized TheraDoc resellers held NASA SEWP contracts and were therefore eligible recipients of the planned delivery order. *See* 2d Am. Compl. Ex. P (ECF No. 52-1 at 115). In brief, the VA intended to procure TheraDoc to satisfy VISN 20's clinical surveillance software needs and would not accept proposals for other clinical surveillance software products.

The second document detailing the VA's procurement plan was the VISN 20 Justification and Approval (VISN 20 J&A) in accordance with FAR Part 16.505(a)(4). *See* 2d Am. Compl. Ex. P (ECF No. 52-1 at 112). The VISN 20 J&A "documents the necessity of a brand-name only procurement for TheraDoc." *Id.* The VISN 20 J&A explained that continuing TheraDoc in VISN 20 was necessary so the agency could focus its resources on its upcoming transition to the Cerner Electronic Health Record (EHR). *Id.*

The VA's Cerner transition is a tale unto itself, though tied to the development of this litigation. In fact, the VA's partnership with Cerner was the subject of previous litigation. *See CliniComp Int'l, Inc. v. United States*, 134 Fed. Cl. 736 (2017), *aff'd*, 904 F.3d 1353 (Fed. Cir. 2018). In 2017, the VA moved to adopt a new modern electronic health records (EHR) system, Cerner Millenium, to replace the VA's legacy EHR system, VistA. McDonald Decl. ¶ 9; *see CliniComp Int'l*, 134 Fed. Cl. at 741. The VA reported that it was presently "in the process of

migrating all of its hospitals to a new modern Electronic Health Record system, Cerner." McDonald Decl. ¶ 9.  Cerner was intended to "replace[] the functionality of more than 130 separate medical software systems used at VA facilities," including clinical surveillance software.  *Id.*

VISN 20 "was the first VISN to have sites transition to the new Cerner system."  *Id.* However, not all of VISN 20's facilities had transitioned to the Cerner system.  Four facilities — Alaska, Boise, Portland, and Puget Sound — "[had] not yet transitioned to the Cerner EHR" and still used TheraDoc to satisfy their clinical surveillance software needs.  2d Am. Compl., Ex. P (ECF No. 52-1 at 112).  Those four VISN 20 facilities were scheduled to transition to Cerner between May and August 2024.  *Id.* at 113.  Once those sites transitioned to Cerner, they would no longer use TheraDoc.  *Id.*

The 2024 Cerner transition was central to the VA's decision to issue a brand-name procurement for TheraDoc in VISN 20.  The VA reasoned it made little sense to procure and install a different clinical surveillance software in VISN 20 that would be replaced by Cerner within 18 months.  *Id.* at 115–16; *see* McDonald Decl. ¶¶ 11–19.  According to the Government, transitioning to a new software, including training staff on this new system, during this time "would divert technical and clinical resources from [VISN 20's] efforts to accomplish the Cerner transition." McDonald Decl. ¶ 13.  If the Government needed a long-term solution, VISN 20's clinical surveillance software needs "would be competed open-market unrestricted."  2d Am. Compl., Ex. P (ECF No. 52-1 at 116).  However, the four, above-noted VISN 20 facilities were currently using TheraDoc during the Cerner transition, so maintaining the status quo and keeping TheraDoc "as a short-term solution" was the "most advantageous" option for the VA.  *Id.*

In summary, to meet VISN 20's clinical surveillance software needs after its TheraDoc license expired on March 31, 2023, and prior to the Cerner transition, the VA intended to procure

TheraDoc under the NASA SEWP V GWAC.[7]  The VISN 20 procurement would "result in a task order award under one of the existing SEWP V contracts."  Defendant's Status Report (ECF No. 47) at 1.

V.      **Bitscopic's Second Amended Complaint, its Second Revised Motion for a Preliminary Injunction, and Defendants' Cross-Motions**

A.      **Bitscopic's Second Amended Complaint and Second Revised Motion for a Preliminary Injunction**

On March 8, 2023, Bitscopic filed its Second Amended Complaint in light of the VA's proposed brand-name procurement in VISN 20.  *See* 2d Am. Compl.  The Second Amended Complaint, which is the operative complaint related to the present motions, includes four counts.

Count I challenges the VISN 20 SOW and the VISN 20 J&A.  Citing FAR Part 6 and Part 11, Bitscopic argues the proposed VISN 20 brand-name procurement, as summarized in the VISN 20 SOW and justified in the VISN 20 J&A, violates regulations governing brand-name procurements.  *See* 2d Am. Compl. ¶¶ 35–49 (relying on FAR 11.002, 11.105, 6.302, 6.303).

Count II relies on the combined effect of the SBA Rule of Two and the Nonmanufacturer Rule.  Bitscopic contends "the VA's procurement action, and its procurements of clinical surveillance software generally, suffer from critical noncompliance with statutory and regulatory obligations."  2d Am. Compl. ¶ 51; *see id.* ¶¶ 51–62.  Under the SBA's Rule of Two, FAR 19.502-2(b), an agency "shall set aside any acquisition over the simplified acquisition threshold for small business participation when there is a reasonable expectation" that (1) offers will be obtained from

---

[7] The VA agreed to "stay any award in the pending VISN 20 procurement until April 28, 2023 to facilitate judicial review of the plaintiff's motion for preliminary injunction."  Joint Status Report (ECF No. 50) at 1.  To that end, the VA executed a bridge contract "to maintain TheraDoc services at four VISN 20 facilities between April 1, 2023 and April 30, 2023."  *Id.*

at least two responsible small businesses and (2) award will be made at fair market price.[8]  FAR 19.502-2(b).  Accordingly, if two or more responsible small businesses can be expected to submit reasonable offers for a procurement, the SBA Rule of Two requires the agency to set aside that procurement for small businesses.  *See* 2d Am. Compl. ¶¶ 52–53; FAR 19.502-2(b).

Count II then cites the Nonmanufacturer Rule to challenge the procurement of TheraDoc.  The Nonmanufacturer Rule applies to entities that, for a particular procurement, do not manufacture their own products but rather supply the product of another business.  The Rule states that a firm "may qualify as a small business concern . . . as a nonmanufacturer" if it "[w]ill supply the end item of a small business manufacturer, processor or producer made in the United States, or obtains a waiver."  13 C.F.R. § 121.406(b); *see also* 15 U.S.C. § 637(a)(17).  Put another way, a nonmanufacturing entity, or reseller, may only qualify as a small business for a small business set-aside procurement if the reseller supplies the end item of another small business.  13 C.F.R. § 121.406(b).  If a small business reseller supplies the end item of a large business, the reseller would not qualify as a small business under the Nonmanufacturer Rule.  *Id.*

Bitscopic contends that the combined effect of the SBA Rule of Two and the Nonmanufacturer Rule precludes the VA from ever purchasing TheraDoc.  *See* 2d Am. Compl. ¶¶ 51, 61–62.  Bitscopic alleges there are multiple small businesses that sell clinical surveillance software at a fair market price; thus, it contends the SBA Rule of Two requires that the VA's clinical surveillance software procurements must be set aside for small businesses.  *See* 2d Am. Compl. ¶ 53.  It is undisputed that DSS, which develops TheraDoc, is currently considered a large business as relevant to this protest.  *See id.* ¶ 61; *see also* Oral Arg. Tr. at 149:22–150:17 (DSS confirming it is not a small business "for the NAICS codes that have been relevant to this particular

---

[8] The simplified acquisition threshold is $250,000.  *See* FAR Part 2.101.

protest").  Therefore, Plaintiff asserts that a reseller of TheraDoc cannot qualify as a small business due to the Nonmanufacturer Rule and cannot compete for small business set-aside procurements.  *See* 2d Am. Compl. ¶ 61 ("[E]ven though a reseller of TheraDoc may be a small business generally, . . . no reseller can be treated as a small business when it resells TheraDoc.").

Count III is structurally identical to Count II but relies on the VA's Rule of Two instead of the SBA's Rule of Two.  The VA Rule of Two states that the agency "shall award contracts on the basis of competition restricted to" veteran-owned small businesses (VOSBs) or service-disabled veteran-owned small businesses (SDVOSBs) if the contracting officer can expect at least two VOSBs or SDVOSBs to submit offers at a fair and reasonable price.  38 U.S.C. § 8127(d)(1). Bitscopic contends "[t]here are many VOSB or SDVOSB resellers of clinical surveillance software that could meet the Agency's needs."  2d Am. Compl. ¶ 65.  Accordingly, the VA's clinical surveillance software procurements must be set aside for VOSBs or SDVOSBs.  And, Bitscopic contends the Nonmanufacturer Rule again applies to such VOSB or SDVOSB set-aside procurements.  *Id.* ¶ 67.  Therefore, according to Bitscopic, any VOSB or SDVOSB reseller of TheraDoc would not qualify as a small business and is not eligible for the VA's clinical surveillance software procurements that, according to the VA Rule of Two, must be set aside for VOSBs or SDVOSBs.  *Id.*

Finally, Count IV alleges that the VA "cannot justify any sole source procurement" on the grounds that the agency "failed to plan for [the Cerner] transition."  2d Am. Compl. at 33. Bitscopic contends the VA "is trying to justify its brand name [SOW] in VISN 20 . . . on the basis that it does not have time to conduct a competitive procurement and transition services."  *Id.* ¶ 70. Bitscopic contends that this justification "cannot provide a basis for limiting competition."  *Id.* According to Bitscopic, the VA's "lack of advance planning" cannot support the VA's planned

brand-name procurement in VISN 20.  *Id.*; *see also id.* ¶ 71 ("[T]he Agency cannot justify this brand name procurement, and this challenge must be sustained.").

As relief, Bitscopic requests that this Court "[d]eclare that [the] VA's planned brand name procurement of TheraDoc clinical surveillance software in VISN 20 violates law and regulation." 2d Am. Compl. at 34.  Bitscopic also asks this Court to "[e]njoin VA from awarding, commencing performance, or modifying an existing contract of any type to procure TheraDoc clinical surveillance software and/or operations and maintenance support of the same."  *Id.*

In support of its second request for relief, seeking a bar on all future procurements of TheraDoc across the VA, Bitscopic informed this Court of other potentially upcoming VA procurements of clinical surveillance software.  *See* 2d Am. Compl. ¶ 33.  Bitscopic identified at least 10 VA entities outside of VISN 20 that are allegedly "in the process of determining [their] need[s] for clinical surveillance software."  *Id.*  In compiling this list, Bitscopic relied on its "own market research" as well as updates provided by the Government.  *See* Defendant's Status Report (ECF No. 25) (the Government providing "updates on the status of other potential TheraDoc procurements").

Together with its Second Amended Complaint, Bitscopic filed a Second Revised Motion for Preliminary Injunction.  *See* PI Mot.  On the merits, Bitscopic relies on the substantive allegations in its Second Amended Complaint.  *Id.* at 28–42.  Bitscopic claims it would be "irreparably harmed by losing the opportunity to fulfill the Agency's needs for clinical surveillance software and the corresponding loss of revenue."  *Id.* at 42.  Bitscopic also contends "it will be forced to spend time, money and effort . . . . policing the Agency's actions."  *Id.*  Bitscopic's requested injunction roughly mirrors the requested relief in its Second Amended Complaint.  *See id.* at 3.  Bitscopic moves this Court to "enjoin the agency from proceeding with the planned brand

name procurement of TheraDoc" in VISN 20 and further "enjoin the Agency from proceeding with any future procurement of TheraDoc software, including but *not limited to* ongoing procurements" in other VA facilities identified by Bitscopic and confirmed by the Government.  *Id.* (emphasis added).

### B.      The Government's and DSS's Cross-Motions to Dismiss

The Government and DSS both cross-moved to dismiss Bitscopic's Second Amended Complaint under Rules 12(b)(1) and 12(b)(6).  *See* Def. Cross-Mot.; Int. Cross-Mot.  The Government raised several threshold deficiencies in Bitscopic's Second Amended Complaint. First, the Government argued Bitscopic is not an "interested party," and therefore lacks standing, because it is not an "actual or prospective bidder" for a NASA SEWP V task order or any other procurement for clinical surveillance software.  Def. Cross-Mot. at 18–22.  The Government also alleged Bitscopic's protest was barred under the Federal Acquisition Streamlining Act of 1994 (FASA), 41 U.S.C. § 4106(f).  *Id.* at 22–29.  The Government finally contended Counts II and IV failed to state a claim because the SBA Rule of Two would never apply to the VA's clinical surveillance software procurements and the VISN 20 SOW and VISN 20 J&A did not justify the brand-name procurement based on the agency's lack of planning.  *Id.* at 29–31.

DSS generally echoed the standing and jurisdiction arguments made by the Government. *See* Int. Cross-Mot. at 15–27.  DSS added that this Court lacks jurisdiction over Bitscopic's Second Amended Complaint to the extent it "alleged violations that are not in connection with a specific procurement or proposed procurement."  *Id.* at 28.  DSS essentially argued that because Bitscopic's allegations and requested relief extend to "future procurements" of TheraDoc, this Court lacks jurisdiction under 28 U.S.C. § 1491(b)(1).  *Id.* at 29.

The Government and DSS also argued that even if Bitscopic possessed standing, and even

if this Court has jurisdiction over Bitscopic's Second Amended Complaint, Bitscopic is still not entitled to injunctive relief. *See* Def. Cross-Mot. at 31–47; Int. Cross-Mot. at 30–44. Most prominently, the Government contended the harm to the Government "substantially outweighs" any harm to Bitscopic. Def. Cross-Mot. at 45–47. The Government emphasized that if VISN 20 is enjoined from using TheraDoc, it "will not be able to implement any substitute clinical surveillance tool." *Id.* at 45. The lack of clinical surveillance software would "result in 'an extreme loss of functionality for medical care providers,'" putting veterans' lives at risk. *Id.* (quoting McDonald Decl. ¶ 11). The Government also argued Bitscopic failed to demonstrate irreparable harm. *Id.* at 43–44.

DSS likewise suggested Bitscopic would not suffer irreparable harm absent a preliminary injunction, at least because Bitscopic's product could win — and indeed has won — future procurements. Int. Cross-Mot. at 32–34 (citing the VA's February 2023 "purchase of Bitscopic's product in St. Louis"). DSS also underscored the harm the VA would suffer if it were enjoined from using TheraDoc. *Id.* at 34–41. DSS focused on TheraDoc's utility detecting sepsis in patients and the devastating toll TheraDoc's absence might have on veteran patient care. *Id.*

## VI.      The VA's Pause of the Cerner Transition

This case took a dramatic pivot when, one business day before oral argument on the pending motions, the VA temporarily halted its transition to Cerner. As previously discussed, the VA has been transitioning to the Cerner EHR system since approximately 2018. *See* McDonald Decl. ¶ 9; 2d Am. Compl. ¶ 31. As reported by the parties, the Cerner transition has been laden with challenges.[9] *See, e.g.*, PI Mot. at 37–40; Oral Arg. Tr. at 114:9–115:5 (Government

---

[9] *See, e.g.*, *VA extends delay of upcoming electronic health record deployments to June 2023 to address technical and other system performance issues*, Office of Pub. and Intragovernmental Affs., U.S. Dep't of Veterans Affs. (Oct. 13, 2022),

acknowledging "issues that have been identified in the Cerner system").  On April 21, 2023, the VA announced it was "stopping work on future deployments of the new [Cerner] EHR as part of a larger program reset."  Declaration of Stephen Allen, Director of Contracting for VHA Network Contracting Office 20, dated Apr. 21, 2023 (ECF No. 83-1) (Apr. 21 Allen Decl.) ¶ 3.  The remaining Cerner deployments in VISN 20 — previously scheduled for mid-2024 — "will not be scheduled until the issues identified with the new EHR are fixed and until VHA is confident that the new EHR is highly functioning at the sites where it is currently in use."  *Id.*

The VA's decision to pause Cerner transitions at all VA facilities had an immediate and significant impact on the proposed brand-name procurement of TheraDoc in VISN 20.  The justification for the brand-name procurement depended solely on the VISN 20 Cerner transition.  *See* VISN 20 J&A.  As noted, the VA had previously concluded it was more advantageous and efficient to maintain TheraDoc in VISN 20 so the facilities could focus on transitioning their systems to the Cerner platform.  *Id.*  Now, with the Cerner transition paused indefinitely, there was no reason to limit competition and conduct a brand-name procurement.  Recognizing this, shortly after the VA halted all Cerner transitions, the Government reported to the Court by declaration that "VISN 20 . . . determined that it will no longer pursue a brand name procurement of TheraDoc software."  Apr. 21 Allen Decl. ¶ 4.  Instead, "VISN 20 will meet its requirement for a clinical surveillance tool through a competitive procurement without reference to a particular brand name or product."  *Id.* ¶ 5.  VISN 20 cancelled the brand-name procurement of TheraDoc through the NASA SEWP V GWAC on April 24, 2023.  *See* Declaration of Stephen Allen, dated Apr. 25,

---

https://www.va.gov/opa/pressrel/pressrelease.cfm?id=5833; *VA announces strategic review of Electronic Health Record Modernization program*, Office of Pub. and Intragovernmental Affs., U.S. Dep't of Veterans Affs. (Mar. 19, 2021), https://www.va.gov/opa/pressrel/pressrelease.cfm?id=5745 (announcing plan to "mitigate challenges" encountered in EHR program); *see also* PI Mot. at 37.

2023 (ECF No. 86-1) (Apr. 25 Allen Decl.) ¶ 3.

**VII.**     **The Government's Motion to Remand**

In light of the Cerner pause and subsequent cancellation of VISN 20's brand-name TheraDoc procurement, the Government filed a Motion to Remand this case on April 21, 2023, one business day prior to the April 24, 2023 scheduled oral argument on the pending motions. *See* Defendant's Opposed Motion for Voluntary Remand (ECF No. 82) (Remand Mot.).   The Government stated that the VA will "issue a new generic statement of work" for a competitive procurement for clinical surveillance software in VISN 20. *Id.* at 2. It further stated that the VA planned to additionally conduct market research "to inform its set aside requirements." *Id.* at 2–3. The Government anticipated the VA would complete market research and issue a new statement of work by June 5, 2023, issue a new solicitation shortly thereafter, and make an award by July 7, 2023. *Id.*; *see also* Apr. 21 Allen Decl. ¶ 6.

The Government contended there was good cause to remand this case to the VA because the original brand-name procurement — "the entire basis for Bitscopic's current complaint" — was cancelled. Remand Mot. at 3. The Government noted, however, that a remand was not necessary regarding "Bitscopic's broader claim that all TheraDoc procurements are *per se* unlawful." *Id.* The Government stated instead that it deferred to this Court "about how to proceed with respect to the pending motions regarding the claims beyond the VISN 20 brand name justification." *Id.* at 4.

Bitscopic opposed a remand, asserting that "nothing has changed." *See* Plaintiff's Opposition to Defendant's Motion to Remand (ECF No. 84) (Pl. Opp.) at 8. Even though the brand-name procurement was cancelled, Bitscopic still contended that the VA "has decided it can lawfully procure TheraDoc in VISN 20 and elsewhere across [the] VA," allegedly in violation of

the Rule of Two and the Nonmanufacturer Rule. *Id.* at 5. In its opposition, Bitscopic highlighted statements by the Government to suggest the VA believes "it can lawfully procure TheraDoc in VISN 20 and elsewhere." *Id.* at 6. Bitscopic urged this Court to "resolve Bitscopic's challenge to that final decision." *Id.*

DSS took no position on whether this Court should remand the case to the VA. *See* Intervenor-Defendant's Response to Defendant's Opposed Motion for Voluntary Remand (ECF No. 85) at 2. DSS emphasized, however, that this Court "should resolve the threshold standing arguments . . . before considering the Motion to Remand." *Id.*

The parties presented their positions regarding the Government's Motion to Remand during the April 24, 2023 oral argument. *See* Oral. Arg. Tr. at 4:12–6:24 (Court requesting that the parties "address the Defendant's motion to remand" during the hearing).

## VIII.     <u>Post-Argument Developments</u>

This Court conducted oral argument on April 24, 2023. During the argument, the Government hinted that VISN 20 may issue a bridge contract for TheraDoc from April 30, 2023 — when VISN 20's current TheraDoc license was set to expire — until VISN 20 makes an award in the new competitive procurement. Oral Arg. Tr. at 29:14–30:2, 117:1–118:3. The Government claimed a bridge contract was necessary to maintain clinical surveillance software in VISN 20 until a potentially new awardee was named. *Id.* Bitscopic argued that, as with all the VA's procurements of TheraDoc, such a bridge contract was unlawful. *Id.* at 99:1–19, 124:15–18. This Court requested the Government file a declaration from a VA representative as soon as the VA had decided whether it required a bridge contract in VISN 20. *Id.* at 30:4–9, 161:15–162:17.

On April 25, 2023, the day following oral argument, the Government filed a second Declaration of Stephen Allen. *See* Defendant' Status Report (ECF No. 86); Apr. 25 Allen Decl.

Mr. Allen provided clarity on VISN 20's anticipated bridge contract.  He stated that "[i]n order to ensure that VISN 20 continues to have access to a clinical surveillance software tool while conducting its competitive procurement, VISN 20 intends to further extend" the incumbent NASA SEWP V task order "for the continued provision of TheraDoc software."  Apr. 25 Allen Decl. ¶ 5. Said differently, the bridge contract would be an extension of the already-existing task order under the NASA SEWP V GWAC.  The extension would prolong the task order from May 1 to July 7, 2023.  *Id.*  Mr. Allen also stated the VA will include an option to further extend the task order from July 8 to December 7, 2023 "to cover any necessary transition time to a new clinical surveillance software if, as a result of the competitive procurement, VISN 20 procures a clinical surveillance software other than TheraDoc."  *Id.* ¶ 6.  The VA anticipated it would finalize the task order extension and the associated justification by April 28, 2023.  Defendant's Status Report (ECF No. 86) at 1.

In response to VISN 20's task order extension, the Court inquired "whether the parties believe additional motion practice or supplemental briefing is necessary."  Minute Order dated Apr. 26, 2023.  The parties agreed that the task order extension "would fall within the scope of Bitscopic's existing complaint," so "the existing motion for preliminary injunction and cross-motions to dismiss . . . apply."  Joint Status Report (ECF No. 87) at 1.  Bitscopic requested supplemental briefing related to the task order extension and asked that "the Court enjoin [the] VA from executing the task order extension prior to April 30, 2023."  *Id.*  The Court granted the request for additional briefing, and the parties filed supplemental briefs on April 27 and April 28.  *See* ECF Nos. 90, 91, 92.

On April 28, 2023, this Court denied Bitscopic's motion for a preliminary injunction "solely as it pertains to Defendant's extension of the incumbent NASA SEWP V task order to

provide clinical surveillance software services to the VISN 20 medical centers through July 7, 2023, and the option to extend the incumbent task order to December 7, 2023, if necessary." Order denying in part Plaintiff's Second Revised Motion for a Preliminary Injunction (ECF No. 95).[10] This Court concluded that it lacked jurisdiction over Bitscopic's protest that was "in connection with the issuance or proposed issuance" of a task order pursuant to the FASA bar, 41 U.S.C. § 4106(f). Transcript of Apr. 28, 2023 Conference (ECF No. 97) (Apr. 28 Conf. Tr.) at 8:6–12:15. This Court also found Bitscopic failed to demonstrate irreparable harm absent an injunction; thus, a preliminary injunction preventing the VA from executing the short-term bridge contract was not appropriate. *Id.* at 12:16–18:18.

IX.     **Supplemental Briefing Regarding Statutory Standing**

On May 10, 2023, two weeks after oral argument on the parties' respective motions, the United States Court of Appeals for the Federal Circuit issued its decision in *CACI, Inc.-Federal v. United States*. 67 F.4th 1145 (Fed. Cir. 2023). In *CACI*, the Federal Circuit held that 28 U.S.C. § 1491(b)(1)'s "interested party" requirement implicates "statutory standing" and therefore "is not jurisdictional." *Id.* at 1151. Accordingly, the Federal Circuit held that its "prior caselaw treating the interested party issue as a jurisdictional issue . . . is no longer good law in this respect." *Id.* (citations omitted).

Shortly after the Federal Circuit's *CACI* decision, the Government filed a Notice of Supplemental Authority requesting supplemental briefing "addressing the parties' respective views of how the standing analysis should proceed in this case in light of" the Federal Circuit's

---

[10] The bridge contract for TheraDoc clinical surveillance software in VISN 20 accordingly falls outside the scope of this Memorandum and Order; as explained, this Court has already ruled that it lacks jurisdiction over Bitscopic's challenge to this task order extension. *See* Apr. 28 Conf. Tr. at 8:6–12:15.

*CACI* decision.  Defendant's Notice of Supplemental Authority (ECF No. 98) at 1.  This Court granted the Government's request and permitted supplemental briefing regarding the implications of the *CACI* decision in this action.  *See* Minute Orders dated May 15 and May 17, 2023.  The parties filed supplemental briefs between May 19 and June 1, 2023.  *See* Defendant's Second Supplemental Brief (ECF No. 100) (Def. *CACI* Brief); Intervenor-Defendant's Second Supplemental Brief (ECF No. 101) (Int. *CACI* Brief); Plaintiff's Response to Defendant's and Intervenor-Defendant's Second Supplemental Briefs (ECF No. 104) (Pl. *CACI* Resp.); Defendant's Reply in Support of Second Supplemental Brief (ECF No. 106) (Def. *CACI* Reply); Intervenor-Defendant's Reply in Support of Second Supplemental Brief (ECF No. 108) (Int. *CACI* Reply).

The Government and DSS argued the Federal Circuit's *CACI* decision does not prevent this Court from addressing statutory standing at this stage in the case.  *See generally* Def. *CACI* Brief; Int. *CACI* Brief.  *CACI*'s only practical impact, according to the Government and DSS, is that dismissal for lack of statutory standing should be under Rule 12(b)(6), not Rule 12(b)(1).  *Id.* In contrast, Bitscopic contended *CACI* confirms this Court can decide the merits of Bitscopic's protest prior to deciding whether Bitscopic has statutory standing.  *See generally* Pl. *CACI* Resp. Bitscopic also argued *CACI* adopted *Lexmark*'s statutory standing analysis, and under *Lexmark*, Bitscopic has statutory standing.  *Id.*

With that background in place, this Court must now address the issues remaining in this action.[11]  At issue here is Bitscopic's challenge to all VA procurements of clinical surveillance

---

[11] On June 28, 2023, the parties filed a Joint Status Report (June 28 JSR) "to alert the Court of factual developments concerning the procurement [in] VISN 20."  Joint Status Report (ECF No. 109) at 1.  The parties reported that on June 15, 2023, and consistent with the VISN 20 procurement schedule provided by Mr. Stephen Allen in his declaration to this Court, the VA issued a Request for Quote (RFQ) as a task order solicitation under the NASA SEWP V IDIQ contract.  *Id.*; *see*

software, including the planned competitive procurement in VISN 20 and the non-VISN 20 pending procurements Bitscopic identified in its Second Amended Complaint; as well as any future procurements of clinical surveillance software. *See* 2d Am. Compl. ¶¶ 50–72.

---

Apr. 21 Allen Decl. ¶ 6. The parties jointly report that the task order solicitation was "issued as a 100% set-aside procurement" for SDVOSBs. June 28 JSR at 1. The June 28 JSR further stated that two companies submitted questions in response to the RFQ: ThunderCat Technology, LLC (a PraediAlert reseller) and Minburn Technology Group, LLC (a TheraDoc reseller); neither of those resellers are parties to this action. *Id.* at 2. The deadline for quote submission is 12:00 PT on June 29, 2023. *Id.* Bitscopic requested a "status hearing" regarding concerns Bitscopic has with the VA's administration of the task order solicitation. *Id.* The Government and DSS believe a status hearing is unnecessary because Bitscopic's concerns are irrelevant to the motions pending before this Court. *Id.* at 3.

The Government and DSS are correct. There is no need for this Court to conduct a status conference on the factual developments reflected in the June 28 JSR. As an initial matter, Bitscopic has not moved to amend its Second Amended Complaint, which is still the operative complaint and the subject of the Government's and DSS's cross-motions to dismiss. *See* Def. Cross-Mot.; Int. Cross-Mot. Furthermore, even if Bitscopic were to amend its Second Amended Complaint to incorporate the factual developments reflected in the June 28 JSR, it would be of no moment because the statutory standing infirmities discussed *infra*, Discussion Section II, would likely still remain. At minimum, there is no debate that Bitscopic itself is not an actual or prospective bidder on the pending task order solicitation under the NASA SEWP V IDIQ contract in VISN 20. *See e.g.,* Oral Arg. Tr. at 152:20–153:4 (acknowledging that Bitscopic is not eligible to bid on task orders under the NASA SEWP V IDIQ contract). Notably, the only two companies the June 28 JSR suggests have an interest in submitting bids pursuant to the RFQ are ThunderCat and Minburn, neither of which are a party to this action. *See* June 28 JSR at 2. The June 28 JSR does not state that Bitscopic or DSS intend to submit bids. In addition, by its own admission to this Court, Bitscopic cannot submit a bid under the RFQ. The pending task order solicitation under the NASA SEWP V IDIQ contract is a 100% set-aside for SDVOSBs, and Bitscopic agreed at oral argument that it is not eligible to bid on procurements restricted to SDVOSBs. *See id.* at 1; Oral Arg. Tr. at 62:21–63:15 (Bitscopic agreeing it "would not be eligible" to bid on a SDVOSB set-aside procurement); *id.* at 75:25–76:12 (Bitscopic agreeing it would "lose jurisdiction to challenge" a SDVOSB set-aside procurement). The pending task order solicitation in VISN 20 is best viewed as a new procurement. Should Bitscopic wish to challenge this RFQ or an eventual VA decision thereunder, it must file a new bid protest action. Accordingly, the June 28 JSR is not relevant to the issues addressed in this Memorandum and Order; and, even if it were relevant, the statutory standing analysis herein would likely apply with equal force to the SDVOSB set-aside task order solicitation in VISN 20. *See infra*, Discussion Section II.

## <u>APPLICABLE LEGAL STANDARD</u>

Under the Tucker Act, this Court has jurisdiction over actions "by an interested party objecting to . . . any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); *see* 2d Am. Compl. ¶ 4. To invoke this Court's bid protest jurisdiction, a protestor must establish both statutory standing and subject matter jurisdiction. *See Reynolds v. Army and Air Force Exchange Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) ("[Plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence."); *see also Starr Int'l Co., Inc. v. United States*, 856 F.3d 953, 964 (Fed. Cir. 2017) ("The plaintiff bears the burden of showing standing.").

First, a protestor must establish that it has statutory standing as an "interested party."[12] *See CACI*, 67 F.4th at 1151.[13] An "interested party" under 28 U.S.C. § 1491(b)(1) is (1) an actual or prospective bidder or offeror (2) whose direct economic interest would be affected by the award

---

[12] This Court disagrees with Bitscopic's contention that *CACI* "confirms that this Court must evaluate standing per *Lexmark*." Pl. *CACI* Resp. at 3. The Federal Circuit relied on *Lexmark* only for the proposition that "statutory standing . . . is not jurisdictional." *CACI*, 67 F.4th at 1151. *CACI*'s holding was cabined in this regard; the opinion does not state or imply that it was supplanting the Federal Circuit's traditional "interested party" standing inquiry. Indeed, *CACI* expressly limits its holding, overruling prior jurisprudence only to the extent such "caselaw treat[ed] the interested party issue as a jurisdictional issue." *Id.* Elsewhere in *CACI*, the Federal Circuit affirmed the validity of its traditional "interested party" standing inquiry. *See id.* ("We have interpreted the statutory language 'interested party' to be an 'actual or prospective bidder[] or offeror[] whose direct economic interest would be affected by the award of the contract or by failure to award the contract.'") (quoting *Rex Serv. Corp.*, 448 F.3d at 1307); *id.* at 1152 ("The Claims Court in some instances must make the statutory standing determination, i.e., whether the plaintiff is an interested party."); *see also infra* note 14.

[13] Though the mandate has not yet issued in *CACI*, this Court nonetheless recognizes *CACI*'s precedential holding that the "interested party" requirement of 28 U.S.C. § 1491(b)(1) implicates a protestor's statutory standing, rather than this Court's jurisdiction. *CACI*, 67 F.4th at 1151; *see also CACI, Inc.-Fed. v. United States*, No. 21-1823 (May 10, 2023), ECF No. 81 (noting the mandate is due July 3, 2023). As noted *supra*, regardless, in the present case the result will be the same whether the analysis is conducted pursuant to Rule 12(b)(6) or 12(b)(1).

of the contract or by failure to award the contract. *See id.*; *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006); *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001). To prove a "direct economic interest," the protestor must establish that it had a "substantial chance" of receiving the contract if the agency did not violate laws or regulations. *Rex. Serv. Corp.*, 448 F.3d at 1308; *Myers Investigative and Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002). In the pre-award context, a protestor may demonstrate "direct economic interest" by establishing it will suffer "a non-trivial competitive injury which can be redressed by judicial relief." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1363 (Fed. Cir. 2009).

Second, a protestor must identify an "alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). This phrase has two requirements: (1) an allegation of a violation of statute or regulation that is (2) in connection with a procurement or a proposed procurement. With respect to the first requirement, "[a] non-frivolous allegation of a statutory or regulatory violation in connection with a procurement or proposed procurement is sufficient to establish jurisdiction." *Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1345 n.1 (Fed. Cir. 2008); *LAX Elecs., Inc. v. United States*, 835 F. App'x 553, 557 (Fed. Cir. 2020). Though the "non-frivolous allegation" standard is generally a low bar, the complaint must nonetheless specify a *violation* in some respect. *Distributed Sols.*, 539 F.3d at 1345 n.1. Indeed, the Federal Circuit has stated the Tucker Act "authorizes the Court of Federal Claims to review *an action*." *Palladian Partners, Inc. v. United States*, 783 F.3d 1243, 1254 (Fed. Cir. 2015) (emphasis added).

Regarding the second requirement, the phrase "in connection with" is "very sweeping in scope." *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999). Thus,

the larger phrase "in connection with a procurement or proposed procurement" includes "a connection with any stage of the federal contracting acquisition process, including 'the process for determining a need for property or services.'" *Distributed Sols.*, 539 F.3d at 1346. To satisfy jurisdiction under the Tucker Act, a protestor must "demonstrate that the government at least initiated a procurement, or initiated 'the process for determining a need.'"[14] *Id.*

When deciding a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the court must accept as true all undisputed facts asserted in the complaint and draw reasonable inferences in favor of the plaintiff. *Acevedo v. United States*, 824 F.3d 1365, 1368 (Fed. Cir. 2016). The plaintiff "bears the burden of establishing the court's jurisdiction over its claims by a preponderance of the evidence." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). The court is not limited to the pleadings to assure itself of its jurisdiction; it may "inquire into jurisdictional facts" to confirm jurisdiction. *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991).

When considering a motion to dismiss pursuant to Rule 12(b)(6), this Court must "take as

---

[14] The Federal Circuit has consistently held that the Tucker Act's requirement of an "alleged violation of statute or regulation in connection with a procurement or a proposed procurement" is jurisdictional. *See Distributed Sols.*, 539 F.3d at 1344–46 (describing the "in connection with a procurement or a proposed procurement" as jurisdictional); *AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1330–31 (Fed. Cir. 2018) (same); *Diaz v. United States*, 853 F.3d 1355, 1357–58 (Fed. Cir. 2017) ("First, subject matter jurisdiction under § 1491(b)(1) may be established for a 'violation of a statute or regulation in connection with a procurement or a proposed procurement.'"). While *CACI* held the "interested party" requirement of Section 1491(b)(1) was not jurisdictional, its holding did not extend to the other requirements of Section 1491(b)(1). *See CACI*, 67 F.4th at 1151. *CACI* overruled *only* prior jurisprudence "treating the interested party issue as a jurisdictional issue." *Id.* Stated differently, *CACI* did not overrule or otherwise disturb Federal Circuit precedent treating the other requirements of Section 1491(b)(1) as jurisdictional. Accordingly, Section 1491(b)(1)'s requirement of an "alleged violation of statute or regulation in connection with a procurement or a proposed procurement" is still a jurisdictional requirement, despite *CACI*. *See id.*; *Distributed Sols.*, 539 F.3d at 1344–46.

true all undisputed facts alleged in the complaint and draw all reasonable inferences based on those allegations." *Vasko v. United States*, 581 F. App'x 894, 897 (Fed. Cir. 2014) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)).  Dismissal for failure to state a claim upon which relief can be granted under Rule 12(b)(6) "is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002); *Welty v. United States*, 926 F.3d 1319, 1323 (Fed. Cir. 2019).  This Court may consider evidence outside the four corners of the complaint to determine whether a plausible claim for relief exists; under Rule 10(c), a "copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes." Rule 10(c).  Thus, on a motion to dismiss for failure to state a claim under Rule 12(b)(6), this Court considers "documents incorporated into the complaint by reference." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007); *Rocky Mt. Helium, LLC v. United States*, 841 F.3d 1320, 1325 (Fed. Cir. 2016) (quoting *Tellabs, Inc.*, 551 U.S. at 322).

The Federal Circuit has suggested that "motions to dismiss based on 'statutory standing' defects are properly brought under Rule 12(b)(6) rather than Rule 12(b)(1) in recognition of the fact that such defects are not jurisdictional." *Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1235 (Fed. Cir. 2019).  This is because the phrase "statutory standing" refers to "a plaintiff's right to pursue a cause of action." *John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394, 402 n.4 (2d Cir. 2018); *see also Lexmark*, 572 U.S. at 128 n.4 (explaining the "statutory standing" inquiry asks whether the plaintiff "has a cause of action").  Therefore, a motion to dismiss on the grounds that the protestor lacks statutory standing under 28 U.S.C. § 1491(b)(1) must be considered under Rule 12(b)(6).  *Lone Star*, 925 F.3d at 1235; *CACI*, 67 F.4th at 1151. Furthermore, "[t]he trial court may dismiss *sua sponte* under Rule 12(b)(6)." *Anaheim Gardens*

*v. United States*, 444 F.3d 1309, 1315 (Fed. Cir. 2006).  This Court may therefore convert a motion

to dismiss under Rule 12(b)(1) to a motion to dismiss under Rule 12(b)(6), particularly where, as

here, the parties have an opportunity to be heard regarding the alternative ground for dismissal.

*See Brown v. United States*, 22 F.4th 1008, 1011–12 (Fed. Cir. 2022); *Vensure Hr, Inc. v. United

States*, 164 Fed. Cl. 276, 284 (2023);  *Roberson v. United States*, 115 Fed. Cl. 234, 241 (2014).


## DISCUSSION

The litigation of this case may be described, at best, as atypical.  The factual landscape and

corresponding legal arguments have shifted on a seemingly constant basis.  Despite this, however,

a consistent issue has existed since the inception of Bitscopic's protest: the jurisdictional and

justiciable deficiencies in Bitscopic's complaint.  This is likely due in part to the VA's

unpredictable and at times disorganized approach to acquiring clinical surveillance software.  *See*

Oral Arg. Tr. at 152:17–19 (Bitscopic stating it has been "shadow-boxing . . . for over four years").

Nevertheless, such behavior by the VA does not afford this Court license to exceed its statutory

limits.  Accordingly, for the reasons discussed below, this Court holds it lacks subject matter

jurisdiction over Bitscopic's Second Amended Complaint under Rules 12(b)(1) and 12(h)(3) to

the extent described in Discussion Sections I and III.  In addition, Bitscopic's Second Amended

Complaint must also be dismissed for failure to state a claim under Rule 12(b)(6) to the extent

described in Discussion Section II.

### I.    Counts I and IV Are Moot

Counts I and IV of Bitscopic's Second Amended Complaint must be dismissed as moot.

A cause of action is moot if "it can be said with assurance that there is no reasonable expectation

that the alleged violation will recur" and "interim relief or events have completely and irrevocably

eradicated the effects of the alleged violation." *Los Angeles Cty. v. Davis*, 440 U.S. 625, 631 (1979) (internal quotations and citations omitted). "When, during the course of litigation, it develops that the relief sought has been granted or that the questions originally in controversy between the parties are no longer at issue, the case should generally be dismissed." *Chapman Law Firm Co. v. Greenleaf Constr. Co.*, 490 F.3d 934, 939 (Fed. Cir. 2007); *see also NEC Corp. v. United States*, 151 F.3d 1361, 1369 (Fed. Cir. 1998) ("If a case becomes moot it no longer presents a justiciable controversy over which a federal court may exercise jurisdiction."); *Durable Metal Prods., Inc. v. United States*, 11 F.3d 1071, 1993 WL 410294, at *3 (Fed. Cir. 1993) ("Since [plaintiff's] claims became moot, . . . it was, therefore, permissible for the Court of Federal Claims to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1)."). In the bid protest context, the Court of Federal Claims "has consistently found that the cancellation of a procurement renders a protest of that procurement moot." *Coastal Env't Grp., Inc. v. United States*, 114 Fed. Cl. 124, 131 (2013).

The analysis here is straightforward. Counts I and IV of Bitscopic's Second Amended Complaint challenge the VA's decision to procure clinical surveillance software in VISN 20 on a brand-name basis restricted to TheraDoc. *See generally* 2d Am. Compl. ¶¶ 34–49, 68–71. Count I contends "[t]he agency issued an unjustified, arbitrary, and capricious brand name solicitation in violation of CICA and FAR." *Id.* at 18. Each of the issues Bitscopic raised in Count I address the VISN 20 SOW and the VISN 20 J&A, which are the documents supporting the VA's decision to procure TheraDoc on a brand-name basis in VISN 20. *See, e.g.*, 2d Am. Compl. ¶ 38 (describing flaws in VISN 20 SOW); *id.* ¶¶ 40–41 (same); *id.* ¶¶ 43–49 (describing flaws in VISN 20 J&A, including that "the J&A failed altogether to meet the regulatory requirements of FAR Part 6 and FAR 11.105 to justify a brand name only procurement"). Count IV likewise challenges the VA's

brand-name procurement of TheraDoc in VISN 20.  Specifically, Count IV alleges the "VA is trying to justify its brand name [procurement] in VISN 20" on the basis that the VA does not have sufficient time to conduct a competitive procurement.  2d Am. Compl. ¶ 70.  Count IV concludes "the Agency cannot justify this brand name procurement, and this challenge must be sustained." *Id.* ¶ 71.

Counts I and IV thus challenge the VA's proposed brand-name procurement of TheraDoc in VISN 20.  However, in a Status Report, the Government presented a declaration from Mr. Allen, Director of Contracting for VISN 20, confirming the "brand name only procurement" was cancelled on April 24, 2023.  Apr. 25 Allen Decl. ¶ 3.  In its place, he avers that the VA will conduct "a competitive procurement without reference to a particular brand name or product."  *Id.* ¶ 4; *see also* Apr. 21 Allen Decl. ¶ 5 ("VISN 20 will meet its requirement for a clinical surveillance tool through a competitive procurement without reference to a particular brand name or product."). The new competitive procurement will require its own Performance Work Statement, which the agency intends to finalize by May 19, 2023.  Apr. 21 Allen Decl. ¶ 5.  It is undisputed that the VISN 20 SOW and VISN 20 J&A, which supported the now-cancelled brand-name procurement, are accordingly void.  *See* Apr. 21 Allen Decl. ¶ 4; Apr. 25 Allen Decl. ¶ 3.  Bitscopic's challenge of a now-cancelled procurement under Counts I and IV is therefore moot.  *See Mitchco Int'l, Inc. v. United States*, 26 F.4th 1373, 1378 (Fed. Cir. 2022) (holding there was "no question" that the protestor's request for injunctive relief was moot because the agency terminated the relevant contract); *Veterans Contracting Grp., Inc. v. United States*, 743 F. App'x 439, 440 (Fed. Cir. 2018) ("[Protestor's] request for retroactive award of the contract at issue is moot because the government terminated the contract."); *B & B Med. Servs., Inc. v. United States*, No. 11-73, 2014 WL 2490283, at *1 (Fed. Cl. June 3, 2014).

That Counts I and IV are moot is illustrated most clearly by considering the relief sought. Both counts argue the VA's brand-name procurement in VISN 20 violates applicable laws and regulations and should be enjoined. *See* 2d Am. Compl. at 18 ("VA's performance work statement is inconsistent with FAR and violates CICA."); *id.* ¶ 49 ("This action must be sustained because the J&A failed . . . to justify a brand name only procurement."); *id.* ¶ 71 ("[T]he Agency cannot justify this brand name procurement, and this challenge must be sustained."). Specifically, Bitscopic requests an injunction under Counts I and IV to prevent the VA from proceeding with the brand-name procurement in VISN 20. *See id.* at 34 (requesting declaration that "VA's planned brand name procurement of TheraDoc clinical surveillance software in VISN 20 violates law and regulation" and an injunction); *see also* PI Mot. at 3 (requesting that this Court "enjoin the Agency from proceeding with the planned brand name procurement of TheraDoc software and services in VISN 20"). However, the VA has already effectively done so. *See* Apr. 21 Allen Decl. ¶ 4; Apr. 25 Allen Decl. ¶ 3. The VA cancelled the brand-name procurement, which was the ultimate aim of Counts I and IV. *See id.*; 2d Am. Compl. ¶¶ 34–49, 68–71. There is nothing further this Court can do to adjudicate Counts I and IV, which no longer present a live case or controversy; accordingly, those counts are moot because "each of the remedies [Bitscopic] originally requested is now beyond the power of this court to grant." *Veterans Contracting Grp.*, 743 F. App'x at 440; *see also Chapman Law Firm*, 490 F.3d at 939.

Furthermore, there is no reasonable expectation that the alleged violation — an unlawful brand-name procurement in VISN 20 — will recur. *See Los Angeles Cty.*, 440 U.S. at 631. The Government represented, via a sworn declaration, that the VA will not pursue a brand-name procurement for clinical surveillance software in VISN 20 but will instead conduct a competitive procurement. *See* Apr. 21 Allen Decl. ¶¶ 5–6; Apr. 25 Allen Decl. ¶ 4. VISN 20 is currently

preparing its competitive procurement.   Apr. 21 Allen Decl. ¶¶ 5–6.   There is no reasonable expectation that the VA will renege on its commitment — or on its representations to this Court — to refrain from pursuing a brand-name procurement in VISN 20.[15]

Interim events have also "completely and irrevocably eradicated the effects of the alleged violation." *Los Angeles Cty.*, 440 U.S. at 631.   The alleged violation was an unlawful brand-name procurement, the effect of which was to exclude all other clinical surveillance products from contention.   The VA's new plan to "meet its requirement for a clinical surveillance tool through a competitive procurement without reference to a particular brand name or product" eradicates the effects of limiting competition to a single brand.   Apr. 25 Allen Decl. ¶ 4.

In short, Counts I and IV of Bitscopic's Second Amended Complaint alleged the VA's brand-name procurement in VISN 20 was unlawful.   The VA has since cancelled that brand-name procurement.   Bitscopic's challenges under Counts I and IV to a now defunct procurement are moot.   *See Mitchco Int'l*, 26 F.4th at 1378; *Veterans Contracting Grp.*, 743 F. App'x at 440; *Coastal Env't Grp.*, 114 Fed. Cl. at 131.   Accordingly, this Court dismisses Counts I and IV of Bitscopic's Second Amended Complaint pursuant to Rules 12(b)(1) and 12(h)(3) for lack of subject matter jurisdiction.   *See North Carolina v. Rice*, 404 U.S. 244, 246 (1971) ("Mootness is a jurisdictional question."); *B & B Med. Servs., Inc. v. United States*, 114 Fed. Cl. 658, 662 (2014) ("When a matter becomes moot, we lose subject-matter jurisdiction over it, and dismissal under [Rule] 12(b)(1) is in order.").

---

[15]   Indeed, had the VA reversed course on its commitment to conduct an open solicitation, Bitscopic, which has vigorously litigated this case, no doubt would have immediately filed a Notice informing the Court of the VA's decision.

## II.       <u>Bitscopic Lacks Standing to Assert Counts II and III</u>

While Counts I and IV are moot, Counts II and III remain.  Counts II and III allege the VA must set aside its clinical surveillance software procurements to small businesses or VOSBs/SDVOSBs, respectively.  *See* 2d Am. Compl. ¶¶ 50–62 (Count II), 63–67 (Count III). Under the Nonmanufacturer Rule, a small business reseller can qualify for a small business set-aside procurement only if that reseller provides a product manufactured by another small business. *See id.* ¶¶ 54–55 (citing 13 C.F.R. § 121.406(b)).  DSS, which develops TheraDoc, is a large business; therefore, Bitscopic alleges, no reseller of TheraDoc can qualify for a small business or VOSB/SDVOSB set-aside procurement.  *See* Oral Arg. Tr. at 149:22–150:17.  Bitscopic thus contends that (i) because *all* VA clinical surveillance software procurements *must* be set aside for small businesses or VOSBs/SDVOSBs, under either the SBA or VA Rule of Two, and (ii) because no reseller of TheraDoc can *ever* qualify as a small business for these set-aside procurements, *all* procurements of TheraDoc are unlawful.  *See* 2d Am. Compl. ¶¶ 51–67; PI Mot. at 40, 41 (Bitscopic arguing "[a]ny VA procurement of TheraDoc is presumptively illegal"); Oral Arg. Tr. at 57:18–19 (Bitscopic contending "it's always illegal to buy TheraDoc").

The Government and DSS argue Bitscopic lacks standing because, based on Bitscopic's own pleadings and legal theories, Bitscopic is not an actual or prospective offeror for the VA's clinical surveillance software procurements.  *See* Def. Cross-Mot. at 21–22; Int. Cross-Mot. at 25–27.  They contend that "[u]nder Bitscopic's own allegations, Bitscopic could never be an 'actual or prospective offeror' because Bitscopic would always be barred [from the VA's clinical surveillance software procurements] under the VA's Rule of Two."  Int. Cross-Mot. at 27.

This Court concludes Bitscopic lacks statutory standing to assert Counts II and III.  As noted, only an "interested party" has statutory standing under 28 U.S.C. § 1491(b)(1).  *See Am.*

*Fed'n of Gov't Emps.*, 258 F.3d at 1302 (holding that "standing under § 1491(b)(1) is limited to" interested parties); *Rex Serv. Corp.*, 448 F.3d at 1307.  An "interested party" must be (1) an actual or prospective bidder (2) whose direct economic interest would be affected by the award of the contract or by failure to award the contract.  *See Am. Fed'n of Gov't Emps.*, 258 F.3d at 1302; *Rex Serv. Corp.*, 448 F.3d at 1307.  Assuming, as this Court must, that all the facts alleged in the complaint are true, Bitscopic itself does not qualify as an "interested party" for purposes of Counts II and III.  Accordingly, Bitscopic lacks statutory standing, and this Court must dismiss Counts II and III pursuant to Rule 12(b)(6).[16]

> ### A.  Bitscopic Is Not an Actual or Prospective Bidder for the VA's Clinical Surveillance Software Procurements

To qualify as an "interested party" under the Tucker Act, the protestor must be an actual or prospective bidder.  An actual bidder is one whom submitted an offer on the protested solicitation.  *See Rex Serv. Corp.*, 448 F.3d at 1307–08.  A prospective bidder is one whom expects to submit a bid.  *See MCI Telecomms. Corp. v. United States*, 878 F.2d 362, 365 (Fed. Cir. 1989); *Rex Serv. Corp.*, 448 F.3d at 1308 (concluding protestor was not a "prospective bidder" because it

---

[16] The Government and DSS originally moved to dismiss Bitscopic's Second Amended Complaint for lack of standing under Rule 12(b)(1) on the basis that Bitscopic was not an "interested party." *See* Def. Cross-Mot. at 18–22; Int. Cross-Mot. at 25–27.  After the parties briefed the motions, the Federal Circuit issued *CACI*. *See supra* Background Section IX.  In *CACI*, the Federal Circuit clarified that the "interested party" requirement of 28 U.S.C. § 1491(b)(1) implicates statutory standing and is no longer considered a jurisdictional requirement; therefore Rule 12(b)(1) is no longer the appropriate vehicle under this Court's Rules to resolve the motion. *CACI*, 67 F.4th at 1151.  As discussed *supra*, a motion to dismiss for lack of statutory standing is properly considered under Rule 12(b)(6). *See Lone Star*, 925 F.3d at 1235.  The parties submitted briefing on the impact of the *CACI* decision and therefore had an opportunity to be heard; there is therefore no prejudice to any party by considering the pending motions to dismiss under Rule 12(b)(6). *See generally* Def. *CACI* Brief; Int. *CACI* Brief; Pl. *CACI* Resp.; Def. *CACI* Reply; Int. *CACI* Reply.  Accordingly, the Court may properly convert the Government's and DSS's motions to dismiss for lack of standing under Rule 12(b)(1) to motions to dismiss under Rule 12(b)(6), and does so here considering the intervening change in law mandated by *CACI*. *See Anaheim Gardens*, 444 F.3d at 1315; *Vensure Hr*, 164 Fed. Cl. at 284; *Roberson*, 115 Fed. Cl. at 241.

"did not submit a bid"); *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1385 (Fed. Cir. 2012).

Based on the factual assertions in the Second Amended Complaint, it is evident that Bitscopic is not an actual or prospective bidder on *any* of the VA's clinical surveillance software procurements.  It is important to reiterate at this stage, when deciding a motion to dismiss the complaint, this Court is "obligated to assume all factual allegations to be true." *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995); *Meidinger v. United States*, 989 F.3d 1353, 1357 (Fed. Cir. 2021).  Throughout its Second Amended Complaint, Bitscopic alleges there exist at least two VOSB or SDVOSB providers of clinical surveillance software.  For example, Bitscopic claims "there are several SDVOSBs and VOSBs that sell clinical surveillance software." 2d Am. Compl. ¶ 10.  Bitscopic later asserts "[t]here are multiple veteran-owned small businesses that provide clinical surveillance software," and "there are more than two veteran-owned and controlled small businesses that provide qualifying clinical surveillance software." *Id.* ¶ 66.  This factual assertion — that there are more than two qualified VOSB or SDVOSB providers of clinical surveillance software — is not disputed by the Government or DSS.  Indeed, the Government agrees. *See* Def. Cross-Mot. at 21 ("Bitscopic alleges, and we agree, that there are at least two eligible SDVOSBs that sell clinical surveillance software."); Oral Arg. Tr. at 10:2–23 (Government agreeing "there are far more than two . . . probably up to a dozen" VOSB/SDVOSB resellers of VA-approved clinical surveillance software).  This Court is therefore required to assume as true, consistent with Bitscopic's Second Amended Complaint, that there are more than two qualified VOSB or SDVOSB providers of clinical surveillance software. *See* 2d Am. Compl. ¶¶ 10, 66.

This factual allegation is necessary for Bitscopic to maintain a claim on the merits of Count III.  Bitscopic alleges there are more than two VOSBs or SDVOSBs that can submit reasonable

offers; therefore, "the VA is required to seek [VOSB or SDVOSB resellers of clinical surveillance software] in *any procurement action*" due to the VA Rule of Two.  2d Am. Compl. ¶ 65 (emphasis added).   Said differently, the VA must always set aside its clinical surveillance software procurements for VOSBs or SDVOSBs.  *Id.* ¶¶ 65–66; PI Mot. at 41–42.  The Nonmanufacturer Rule then kicks in to prevent a reseller of TheraDoc from qualifying as a small business under those set-aside procurements.  *See* 2d Am. Compl. ¶ 67.   Thus, Bitscopic alleges that the Nonmanufacturer Rule precludes the VA from buying TheraDoc in all instances only because the VA Rule of Two applies in all instances; and the VA Rule of Two applies in all instances solely because there are more than two VOSB or SDVOSB providers of clinical surveillance software.

Bitscopic's undisputed assertion that the VA Rule of Two applies in all instances cuts both ways, as it is also undisputed that Bitscopic is not a VOSB or SDVOSB.  *See* 2d Am. Compl. ¶ 1 (Bitscopic is "a minority-owned small business"); Oral Arg. Tr. at 51:24–25 (Bitscopic's counsel agreeing Bitscopic is not a VOSB or SDVOSB).   Accordingly, based on its own arguments, Bitscopic can *never* lawfully bid on the VA's clinical surveillance software procurements.  2d Am. Compl. ¶¶ 10, 65–67.  Consistent with Bitscopic's own contentions, those procurements must be set aside for VOSBs and SDVOSBs, and it is undisputed that Bitscopic is neither a VOSB nor a SDVOSB.  2d Am. Compl. ¶¶ 1, 10, 65–67; Oral Arg. Tr. at 51:24–25.  Based on the factual allegations pleaded in its Second Amended Complaint, Bitscopic cannot accordingly qualify as an "actual or prospective bidder," as it cannot bid on any clinical surveillance procurements at issue here.  Thus, based on its pleadings, as Bitscopic is not an "actual or prospective bidder," it is not an "interested party" under the Tucker Act.  *See Rex Serv. Corp.*, 448 F.3d at 1307 ("[T]o come within the Court of Federal Claims' section 1491(b)(1) bid protest jurisdiction, [the protestor] is required to establish that it . . . is an actual or prospective bidder[.]").

**B.    Bitscopic Cannot Demonstrate a Direct Economic Interest in the VA's Clinical Surveillance Software Procurements**

Bitscopic is not an "interested party" for an additional reason: it does not have a direct economic interest in the VA's clinical surveillance software procurements.  To qualify as an "interested party," a protestor must have a direct economic interest in the relevant procurement. *See Rex. Serv. Corp.*, 448 F.3d at 1307.  To establish a direct economic interest, the protestor must show that it had a "substantial chance" to receive the contract but for the agency's error.  *See id.* at 1308; *Myers*, 275 F.3d at 1370 (observing "the substantial chance rule continues to apply" to the standing inquiry).

Bitscopic's own factual allegations here demonstrate just the opposite; taking its allegations as true, as this Court must, it is evident that Bitscopic does not stand a "substantial chance" at an award of a clinical surveillance software contract.  In fact, Bitscopic stands no chance at all.  The VA's clinical surveillance software procurements can be awarded only to VOSBs or SDVOSBs.  *See* 2d Am. Compl. ¶¶ 65–66.  Bitscopic is not a VOSB or SDVOSB, so it is not eligible to receive any VA clinical surveillance software contracts.  *See id.*; Oral Arg. Tr. at 51:24–25.  To establish it would have a substantial chance at award, Bitscopic must "show that it would have been a qualified bidder."  *Myers*, 275 F.3d at 1370–71.  Like the protestor in *Myers*, "[t]his [Bitscopic] has not done."  *Id.* at 1371.

The Federal Circuit's reasoning in *Tinton Falls Lodging Realty, LLC v. United States* supports this Court's conclusion that if a protestor's own theories of relief render it ineligible for award, the protestor does not have a substantial chance at award.  800 F.3d 1353 (Fed. Cir. 2015). In *Tinton Falls*, the Federal Circuit summarized that "the question of standing [there] hinge[d] on whether [the protestor] could compete for a reopened bid if it [won] its protest of the initial contract award."  *Id.* at 1360.  The Federal Circuit agreed with the trial court that the protestor "could

compete for the reopened bid if it prevail[ed]" and that the protestor therefore had standing. *Id.* The situation here is the converse of that in *Tinton Falls*. If Bitscopic were to prevail under Count III, it could *never* compete for the procurement, because under the VA Rule of Two, all procurements would be set aside for VOSBs or SDVOSBs and Bitscopic does not qualify as a VOSB or SDVOSB. *See* 2d Am. Compl. ¶¶ 10, 65–66; Def. Cross-Mot. at 21–22; Oral Arg. Tr. at 51:24–25. While the protestor in *Tinton Falls* had standing because it *could* compete for the award if it prevailed, Bitscopic lacks statutory standing here because it *cannot* compete if it prevails. Bitscopic therefore cannot demonstrate it would have a "substantial chance" at award and, consequently, cannot establish it has a "direct economic interest" in the relevant procurement to qualify as an "interested party." *See Tinton Falls*, 800 F.3d at 1358; *Rex. Serv. Corp.*, 448 F.3d at 1307–08; *Myers*, 275 F.3d at 1370; *see also Top Gun Servs., LLC v. United States*, 150 Fed. Cl. 696, 700–01 (2020) (holding protestor "failed to establish it would have had a substantial chance of winning the award" because the protestor was not eligible for award); *BlueStar Energy Servs., Inc. v. United States*, 100 Fed. Cl. 607, 618–19 (2011) (concluding "[i]f plaintiff is ineligible to be listed [in the SDVOSB database], it cannot show a substantial chance of securing the contract" and therefore "is not an interested party for Tucker Act purposes"); *CS-360, LLC v. United States*, 94 Fed. Cl. 488, 500 (2010) ("Because plaintiff is ineligible to be listed [in the SDVOSB database], it cannot show a substantial chance of securing the contract.").

In supplemental briefing, Bitscopic appeared to argue the pre-award "direct economic interest" standard should apply instead. *See* Pl. *CACI* Resp. at 6. Bitscopic contended that "[i]n this pre-award posture," Bitscopic is "held to a less demanding standard" and must only show that it suffered "a non-trivial competitive injury which can be redressed by judicial relief." *Id.* (citing *Weeks Marine*, 575 F.3d at 1361–62). However, even if the pre-award "non-trivial competitive

injury" standard applies, it makes no difference to Bitscopic's statutory standing.  The Federal Circuit clarified in *CliniComp International* that "to suffer a non-trivial *competitive injury*," the protestor "must at least be qualified to compete for the contract it seeks."  *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1360 (Fed. Cir. 2018) (emphasis in original).  Here, there is no dispute that based on the factual allegations in Bitscopic's complaint, Bitscopic is not eligible to compete for any of the VA's clinical surveillance software contracts.  *See* 2d Am. Compl. ¶¶ 10, 65–67; Oral Arg. Tr. at 51:24–25.  As Bitscopic cannot compete for such contracts if its protest succeeds, Bitscopic cannot demonstrate a "non-trivial competitive injury" sufficient to demonstrate statutory standing even in the pre-award context.  *CliniComp Int'l*, 904 F.3d at 1359–60; *CGI Fed. Inc. v. United States*, 779 F.3d 1346, 1351–52 (Fed. Cir. 2015).  Bitscopic argues that unlike in *CliniComp International*, "[t]here is no question . . . whether Bitscopic is a qualified and capable offeror."  Pl. *CACI* Resp. at 6 n.2.  Bitscopic is correct: there is no question that Bitscopic is *not* a qualified offeror, based on the allegations in its complaint.  *See* 2d Am. Compl. ¶¶ 10, 65–67.  While Bitscopic's *product* may be authorized for use by the VA, Bitscopic *itself*, as a non-VOSB and non-SDVOSB, is not a qualified bidder for the VA's clinical surveillance software products based on Bitscopic's own allegations.

In summary, the factual allegations in Bitscopic's Second Amended Complaint establish that all of the VA's clinical surveillance software procurements must be set aside for VOSBs or SDVOSBs.  *See* 2d Am. Compl. ¶¶ 10, 64–67.  It is undisputed that Bitscopic is not a VOSB or SDVOSB.  *See, e.g.*, *id.* ¶ 1; Oral Arg. Tr. at 51:24–25.  Bitscopic therefore is not an "actual or prospective bidder" on the VA's clinical surveillance software procurements.  *See Rex Serv. Corp.*, 448 F.3d at 1307.  Bitscopic also cannot demonstrate it has a "substantial chance" at receiving a contract it is not eligible to receive, nor can plaintiff demonstrate a "non-trivial competitive

injury;" consequently, Bitscopic cannot demonstrate a "direct economic interest" in the VA's clinical surveillance software procurements. *See Weeks Marine*, 575 F.3d at 1359–63; *CliniComp Int'l*, 904 F.3d at 1359–60; *Tinton Falls*, 800 F.3d at 1358; *Myers*, 275 F.3d at 1370; *Am. Fed'n of Gov't Emps.*, 258 F.3d at 1302; *CACI*, 67 F.4th at 1151. Bitscopic is accordingly not an "interested party" under the Tucker Act and lacks statutory standing under Rule 12(b)(6) to challenge the VA's clinical surveillance software procurements. *CACI*, 67 F.4th at 1151.

### C.   The SBA Rule of Two Is Inapplicable to the VA's Procurements of Clinical Surveillance Software at Issue Here

Bitscopic does not rely solely on the VA Rule of Two to challenge the VA's clinical surveillance software procurements. In Count II, Bitscopic alleges the *SBA* Rule of Two requires agencies, including the VA, to set aside procurements for small businesses — not limited to VOSBs or SDVOSBs — "where two or more qualified small businesses can be expected to submit proposals at a fair and reasonable price." 2d Am. Compl. ¶ 51. Bitscopic contends "[t]here are multiple small businesses that provide clinical surveillance software, including Bitscopic itself." *Id.* ¶ 53. Bitscopic further contends that since it is a small business, it is not excluded from eligibility (like it is when the VA Rule of Two applies); Bitscopic is eligible to receive contracts set aside for small businesses. *See id.* ¶ 62; Pl. Resp. at 8–12, 29. Bitscopic thus contends it has statutory standing to assert Count II. *See* Pl. Resp. at 12.

However, based on the factual allegations contained in Bitscopic's Second Amended Complaint, the SBA Rule of Two will never apply to the VA's clinical surveillance software procurements. *See* 2d Am. Compl. ¶¶ 10, 65–66. This is because the VA Rule of Two — which applies in all instances based on Bitscopic's factual allegations — takes precedence over the SBA Rule of Two. Indeed, the Supreme Court of the United States has ruled that the VA Rule of Two, 38 U.S.C. § 8127(d), "unambiguously requires the [VA] to use the Rule of Two before contracting

43

under the competitive procedures." *Kingdomware Technologies, Inc. v. United States*, 579 U.S. 162, 171 (2016). It is well-established in all procurements, the VA "must first apply the [VA] Rule of Two" before awarding a contract to a non-VOSB or non-SDVOSB entity. *Id.* at 172. Under *Kingdomware*, therefore, if two or more qualified VOSBs or SDVOSBs are expected to submit fair and reasonable bids, the VA is required, in the first instance, to set aside that procurement for VOSBs or SDVOSBs. *See* 38 U.S.C. § 8127(d).

As noted, Bitscopic and the Government agree more than two VOSBs or SDVOSBs exist that can satisfy the VA's clinical surveillance software needs. *See* 2d Am. Compl. ¶¶ 65–67; Def. Cross-Mot. at 21. Accordingly, based on Bitscopic's factual allegations in the Second Amended Complaint, every clinical surveillance software procurement must be set aside for VOSBs or SDVOSBs.[17] 2d Am. Compl. ¶¶ 10, 65–67; *Kingdomware*, 579 U.S. at 171–72. The SBA Rule of Two will therefore never apply to the VA's clinical surveillance software procurements at issue here. Indeed, even Bitscopic acknowledges the VA Rule of Two supersedes the SBA Rule of Two. *See* 2d Am. Compl. ¶ 10 ("The VA must procure clinical surveillance software via [VOSBs and SDVOSBs] because more than two are available to meet the VA's needs.") (citing *Kingdomware*); Oral Arg. Tr. at 78:18–19 (Bitscopic "does not contest . . . the primacy of the VA rule of two").

Accordingly, as discussed *supra*, Bitscopic lacks statutory standing to assert the VA Rule of Two (Count III) against the VA's clinical surveillance software procurements. *See supra*, Discussion Sections II.A, II.B. Bitscopic's additional challenge relying on the SBA Rule of Two (Count II) is entirely subsumed by its argument relying on the VA Rule of Two (Count III).

---

[17] Indeed, compliance with the VA Rule of Two necessarily satisfies the SBA Rule of Two. VOSBs and SDVOSBs are small businesses, so setting aside procurements for VOSBs and SDVOSBs satisfies the SBA Rule of Two's broader stricture to set aside procurements for small businesses generally.

Therefore, Bitscopic lacks statutory standing to assert the SBA Rule of Two as well; and Bitscopic's reliance on the SBA Rule of Two cannot afford a basis for relief.  Though this Court must analyze standing on a claim-by-claim basis, it is equally true that it "cannot analyze standing in a vacuum."  *Digitalis*, 664 F.3d at 1386.  This Court cannot ignore the Second Amended Complaint's repeated factual assertions that there are multiple qualified VOSB and SDVOSB resellers of clinical surveillance software capable of meeting the VA's needs, depriving Bitscopic of statutory standing to challenge the VA's clinical surveillance software procurements as a matter of law, even based on the SBA Rule of Two.  *See* 2d Am. Compl. ¶¶ 10, 64–67; *see also Henke*, 60 F.3d at 797 ("[I]n deciding the Government's motion to dismiss [the] complaint, the court was obligated to assume all factual allegations to be true."); *Kingdomware*, 579 U.S. at 171–74; *PDS Consultants, Inc. v. United States*, 907 F.3d 1345, 1360 (Fed. Cir. 2018) ("[W]e may not ignore the [Supreme] Court's finding that . . . § 8127(d) 'requires the [VA] to apply the Rule of Two to *all* contracting determinations and to award contracts to veteran-owned small businesses.'") (quoting *Kingdomware*, 579 U.S. at 171).  Accordingly, this Court must dismiss Count II pursuant to Rule 12(b)(6).  *See Lindsay*, 295 F.3d at 1257 ("A motion to dismiss under [Rule 12(b)(6)] for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy.").

### D.   Bitscopic's Remaining Arguments Are Not Persuasive

Bitscopic has consistently failed to rebut the Government's and DSS's standing arguments.  In its Second Amended Complaint, Bitscopic claims it "meets the jurisdictional standard because it is a prospective bidder in competitive VA procurements for clinical surveillance software solutions and its direct economic interests are impacted by the VA's noncompetitive, sole source or brand name awards of TheraDoc clinical surveillance software."  2d Am. Compl. ¶ 7.  That

argument ignores the fatal implication of Bitscopic's repeated assertions that the VA's clinical surveillance software procurements must be set aside, in every instance, for VOSBs and SDVOSBs.  *See* 2d Am. Compl. ¶¶ 10, 65–67; PI Mot. at 41.  Bitscopic also claims in its opposition that "[b]ecause Bitscopic provides a product that would meet VA needs, Bitscopic is a qualified bidder."  Pl. Resp. at 10.  That is simply not the case.  While Bitscopic may provide an approved product, often through a reseller, Bitscopic *itself* is not a qualified bidder on procurements that, according to Bitscopic's undisputed factual allegations, must be set aside for VOSBs or SDVOSBs.  *See* 2d Am. Compl. ¶¶ 10, 65–67; Def. Cross-Mot. at 21; Oral Arg. Tr. at 10:2–23 (Government agreeing "there are far more than two . . . probably up to a dozen" VOSB/SDVOSB resellers of VA-approved clinical surveillance software).

 To combat this inconsistency, Bitscopic repeatedly tries to piggyback on the statutory standing of its VOSB and SDVOSB resellers, which are notably absent from this case.  *See, e.g.*, 2d Am. Compl. ¶ 67 ("Bitscopic, a prospective offeror in competitive VA procurements, has a direct economic interest in VA making such awards to its qualified SDVOSB resellers."); Pl. Resp. at 29 ("Bitscopic . . . has maintained all along that it *or its SDVOSB resellers* could and would compete for any set-aside procurement.") (emphasis added).  Bitscopic engages resellers, including VOSB and SDVOSB resellers, that supply Bitscopic's product to the federal government.  *See* 2d Am. Compl. ¶ 1 ("Bitscopic can and has sold its software . . . via resellers to the government, including the VA."); *id.* ¶ 33 (explaining a Bitscopic SDVOSB reseller, ThunderCat, received an award to provide PraediAlert in St. Louis).  However, prospective suppliers to such resellers, or others who do not *directly* bid on or receive awards from the United States, lack statutory standing under the Tucker Act.  *See Distributed Sols.*, 539 F.3d at 1344 (distinguishing between "interested parties" and "mere 'disappointed subcontractors' without

standing"); *Top Gun Servs.*, 150 Fed. Cl. at 705.  That conclusion flows directly from the Federal

Circuit's direction that an "interested party" must be an actual or prospective bidder that has a

direct economic interest by proving *it* — not its reseller — either had a "substantial chance" at

award or would suffer a "non-trivial competitive injury."  *See CliniComp Int'l*, 904 F.3d at 1359–

60; *Am. Fed'n of Gov't Emps.*, 258 F.3d at 1302; *Rex Serv. Corp.*, 448 F.3d at 1307.  In such

reseller-manufacturer relationships, only the reseller is an "actual or prospective bidder;" and only

the reseller has a "direct economic interest" in the procurement or proposed procurement.  *See* Oral

Arg. Tr. at 13:11–13 (Government agreeing "[i]f Bitscopic itself were an SDVOSB and eligible to

provide these services directly, they would have standing").

The distinction between Bitscopic and its resellers highlights the "more stringent standing

requirements" in place under the Tucker Act as compared to Article III.  *Weeks Marine*, 575 F.3d

at 1359; *see also Sys. Application & Techs.*, 691 F.3d at 1382 ("The 'interested party' standard is

more stringent than the requirements of Article III.").  Bitscopic could likely establish Article III

standing by asserting it had lost revenue due to the VA's allegedly unlawful procurements of its

competitor, TheraDoc.   *See* Declaration of Bill Maher, Director of Sales and Business

Development at Bitscopic (ECF No. 52-2) ¶¶ 4–5 (describing lost revenue and lost profits due to

VA's allegedly improper TheraDoc procurements); *Lujan v. Defs. of Wildlife*., 504 U.S. 555, 560–

61 (1992) (explaining Article III standing requires (1) injury in fact, (2) causal connection, and (3)

redressable injury).   However, that allegation is insufficient to satisfy the statutory standing

requirement under the Tucker Act.  Bitscopic must instead demonstrate it is an "interested party,"

a showing it has failed to make based on the factual allegations in its Second Amended Complaint.

*Weeks Marine*, 575 F.3d at 1359; *Sys. Application & Techs.*, 691 F.3d at 1382; *Myers*, 275 F.3d at

1370–71; *Am. Fed'n of Gov't Emps.*, 258 F.3d at 1302; *CACI*, 67 F.4th at 1151.

When pressed at oral argument, Bitscopic appeared to pivot and hang its hat on allegedly unpredictable results of the VA's market research. *See generally* Oral Arg. Tr. at 69:15–73:15, 109:6–7. While those arguments were not properly before the Court in briefing, the Court nevertheless addresses them here. The VA Rule of Two, 38 U.S.C. § 8127(d), requires the VA to set aside procurements for VOSBs and SDVOSBs if the contracting officer has a "reasonable expectation" that two or more such entities will submit offers. 38 U.S.C. § 8127(d). The contracting officer makes that determination based on market research. *See* FAR Part 10; *see also* Remand Mot. at 3 n.1 (Government explaining that "set aside decision could not be made until after the market research necessary to inform the set aside decision had been completed"). Bitscopic agreed that "[a]ll legitimate market research . . . will show that this procurement must be set aside for a SDVOSB." Oral Arg. Tr. at 71:2–11; *see also* 2d Am. Compl. ¶¶ 10, 64–67. And, if that were the case, Bitscopic agreed it would lack statutory standing. *See* Oral Arg. Tr. at 62:21–63:15 ("The Court: Would you agree if the market research comes out and there [are] more than two eligible [SDVOSBs], that Bitscopic would be ineligible at that point to bid? Bitscopic: [Y]eah, we would not be eligible."); *id.* at 75:25–76:6 ("The Court: So would you agree that if the market research, legitimately in your view, . . . comes up and [the awardee has] to be a SDVOSB . . . [Bitscopic] may lose jurisdiction . . . Bitscopic: That's right, Your Honor.").

In an attempt to side-step its predicament, Bitscopic claims "[c]ontracting officers make mistakes every single day," and that "[i]f [the VA] screw[s] up their market research, [Bitscopic] could possibly be in line for a contract." *Id.* at 71:20–73:21; *see also id.* at 109:6–7 ("So if they do the market research wrong, we can compete."). Bitscopic appears to argue that a VA contracting officer could make a mistake and conclude a clinical surveillance software procurement need not be set aside for VOSBs or SDVOSBs; Bitscopic thus contends that the

48

potential that a contracting officer could make such a mistake means Bitscopic has statutory standing.

Bitscopic bears the burden of establishing statutory standing under the Tucker Act.  *See Myers*, 275 F.3d at 1369–70; *Starr Int'l*, 856 F.3d at 964 ("The plaintiff bears the burden of showing standing.").  Bitscopic cannot meet its burden by relying on a speculative, future potential mistake by a contracting officer.  *See, e.g.*, *Orion Constr. Corp. v. United States*, 125 Fed. Cl. 668, 677 (2016) (holding protestor's "speculation . . . is not sufficient" to meet protestor's burden).  Furthermore, Bitscopic cannot have it both ways: Bitscopic would have this Court assume, for standing purposes only, that the VA may not set aside its clinical surveillance software procurements for VOSBs or SDVOSBs; and then, on the merits, rule for Bitscopic that the VA must set aside its clinical surveillance software procurements for VOSBs and SDVOSBs, thus precluding any procurement of TheraDoc.  Bitscopic's standing sidestep dance is incoherent and contrary to what Bitscopic alleged in its Second Amended Complaint.  *See* 2d Am. Compl. ¶ 65 ("[Because] [t]here are many VOSB or SDVOSB resellers of clinical surveillance software that could meet the Agency's needs[,] the VA is required to seek such providers in any procurement action, including [the VISN 20 procurement].").  Bitscopic cannot meet its burden to establish statutory standing on such contradictory terms.

The statutory standing issue in this case aptly demonstrates a core reason why the doctrine exists in the first place.  As the parties explained, Bitscopic and DSS often sell their clinical surveillance software products to the VA through resellers.  *See* 2d Am. Compl. ¶¶ 1, 3 (explaining Bitscopic and DSS partner with resellers who sell directly to the government); Def. Cross-Mot. at 39 (referencing "TheraDoc resellers"); Declaration of Kara W. Parsley (ECF No. 58-2) ¶ 3 (listing clinical surveillance software resellers that have contracted with the VA).  Many of these resellers

are SDVOSB entities.  *See* Def. Cross-Mot. at 39 (referencing SDVOSB TheraDoc reseller); PI

Mot. at 26–27 (referencing SDVOSB PraediAlert reseller); Oral Arg. Tr. at 13:7–11 (Government

stating "all the resellers are [SDVOSBs] because that's the way that this market has been

structured").  Based on the undisputed factual assertions in the Second Amended Complaint, *only*

VOSB or SDVOSB entities are eligible for the VA's clinical surveillance software procurements.

*See* 2d Am. Compl. ¶¶ 10, 65–67.  Thus, under Bitscopic's own complaint, the only entities that

have statutory standing to challenge the VA's clinical surveillance software procurements are

those VOSB or SDVOSB providers or resellers of clinical surveillance software*.  Id.; see*

*Distributed Sols.*, 539 F.3d at 1344.  Bitscopic, as a small business and not a VOSB or SDVOSB,

"cannot rest [its] claim to relief on the legal rights or interests of third parties." *Kowalski v. Tesmer*,

543 U.S. 125, 129 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)).  Preventing

Bitscopic from litigating the rights of third-party VOSB or SDVOSB resellers of its product, that

are not parties to this litigation, "reflects a due regard for the autonomy of those persons likely to

be most directly affected by a judicial order." *Valley Forge Christian College v. Ams. United for*

*Separation of Church and State, Inc.*, 454 U.S. 464, 473 (1982).

There is good reason here why third party resellers have not joined or intervened in this

litigation.  As but one example, third-party resellers "may not in fact wish to assert the claim in

question." *Starr Int'l*, 856 F.3d at 965.  The Government observed that Thundercat, "an SDVOSB

reseller of Bitscopic's software," also sells products from other large businesses.  Defendant's

Reply in Support of Cross-Motion to Dismiss (ECF No. 65) (Def. Reply) at 11.  A ruling in

Bitscopic's favor regarding the Nonmanufacturer Rule could have profound impacts on

Thundercat's, and other VOSBs' or SDVOSBs', business prospects.  Bitscopic, meanwhile, is not

a VOSB or SDVOSB reseller and would not similarly suffer the potentially far-reaching

repercussions of a decision in its favor.  Of course, Thundercat or other VOSBs or SDVOSBs are not a party to this case, so the extent of their potential injury is not known.  *See* Oral Arg. Tr. at 60.  However, that is the point: standing ensures courts hear arguments from "those who have a direct stake in the outcome." *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) ("The doctrine of standing . . . . requires federal courts to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction.") (internal citations and quotations omitted) (emphasis in original).[18]

For all the reasons explained above, based on the well-pleaded allegations in its Second Amended Complaint, Counts II and III of Bitscopic's Second Amended Complaint must be dismissed under Rule 12(b)(6).[19]

---

[18] Bitscopic also relied on *Percipient.ai, Inc. v. United States*, No. 23-28, (Apr. 7, 2023), ECF No. 44, which was later vacated, in support of its argument.  Bitscopic pointed to a statement — made in a brief order the judge issued prior to his "forthcoming opinion" — that the protestor had standing because it "would have offered its commercial product to the agency either as a subcontractor, a licensee, or even possibly as a prime contractor."  See ECF No. 65-1 at 2–3.  However, *Percipient.ai* is not helpful to Bitscopic's cause.  First, the final opinion in that case cabined its holding to standing under 10 U.S.C. § 3453, which commands defense agencies to acquire commercial products "to the maximum extent practicable." *Percipient.ai*, 2023 WL 2819637, at *3; see also *id.* at *6 ("We thus hold that offerors of commercial products need not bid on the prime contract to have § 3453 standing.").  Bitscopic does not assert that 10 U.S.C. § 3453, or its counterpart at 41 U.S.C. § 3307, applies in this case.  *See generally* 2d Am. Compl. Bitscopic's statutory standing here is based on the Tucker Act, 28 U.S.C. § 1491(b)(1).  *Id.* ¶ 4. Second, *Percipient.ai* concerned a government agency neglecting to incorporate commercial products over in-house solutions.  See *Percipient.ai*, 2023 WL 2819637, at *1–*2.  Here, as the Government observes, "all three clinical surveillance tools that VA has certified as meeting its needs are commercial products."  Defendant's Supplemental Brief (ECF No. 91) at 3. *Percipient.ai* is therefore inapposite to the issues here.  Moreover, as noted, on April 27, 2023, the *Percipient.ai* court granted a motion to reconsider the decision on which Bitscopic relies and subsequently vacated that decision shortly thereafter.  *See Percipient.ai, Inc. v. United States*, No. 23-28 (Apr. 27, 2023), ECF Nos. 52 & 53.  *Percipient.ai* is therefore not applicable.

[19] As discussed *supra*, a protestor's failure to demonstrate it is an "interested party" would previously have warranted dismissal under Rule 12(b)(1) for lack of subject matter jurisdiction.

III.       **Alternatively, Counts II and III Must be Dismissed in Part Under Rules 12(b)(1) and 12(h)(3)**

While Bitscopic lacks statutory standing to bring Counts II and III because it is not an "interested party" under 28 U.S.C. § 1491, that is not the only threshold deficiency of Counts II and III. Bitscopic requests this Court "[e]njoin [the] VA from awarding, commencing performance, or modifying an existing contract of any type to procure TheraDoc clinical surveillance software." 2d Am. Compl. at 34. It also requests this Court "[d]irect [the] VA to conduct all clinical surveillance software and/or service procurements in compliance with statutory and regulatory requirements." *Id.* at 35. Bitscopic essentially asks this Court to enjoin the VA from *ever* procuring TheraDoc, under any circumstances, in *any* procurement, pending or future. *See also* PI Mot. at 3 ("Bitscopic requests that this Court . . . enjoin the agency from proceeding with any future procurement of TheraDoc software . . . ."); Joint Status Report (ECF No. 81) at 4 (Bitscopic alleging statutory violations "continue to plague all VA procurements"); Plaintiff's Opposition to Motion to Remand (ECF No. 84) at 9 (Bitscopic claiming its arguments apply to "every other VA entity seeking to procure clinical surveillance software"); Oral Arg. Tr. at 98:4–6 (Bitscopic arguing "any intention to procure TheraDoc is illegal because it cannot meet the nonmanufacturer rule"); *id.* at 57:18–19 (Bitscopic stating "it's always illegal to buy TheraDoc"). As Bitscopic acknowledges, this is an extraordinary request for relief. *See* PI Mot. at 16 (Bitscopic

---

However, after the Federal Circuit's *CACI* decision, the interested party requirement of 28 U.S.C. § 1491(b)(1) is no longer considered by the Federal Circuit to be jurisdictional in nature. *CACI*, 67 F.4th at 1151. In light of *CACI*, a protestor's failure to show that it is an "interested party" now must be analyzed for failure to state a claim upon which relief can be granted under Rule 12(b)(6). The pre- and post-*CACI* dismissal mechanism under this Court's Rule 12 differs. The Court is mindful that the mandate in *CACI* has not yet issued; thus it also rules that the Court's straightforward holding that Bitscopic lacks statutory standing under the Tucker Act would apply whether the Court were to conduct its analysis under pre-*CACI* Rule 12(b)(1) standards, or as it does here, under post-*CACI* Rule 12(b)(6) standards, with reference to the Second Amended Complaint.

describing its requested relief as "extraordinary").

Bitscopic stretches this Court's limited jurisdiction too far.  As explained below, this Court clearly lacks subject matter jurisdiction over the broad sweep of Counts II and III.  Bitscopic's allegations regarding unannounced, potential, future procurements are not "in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  Therefore, to the extent Bitscopic asserts Counts II and III against any of the VA's future, unidentified procurements of clinical surveillance software, those allegations must also be dismissed under Rule 12(b)(1) and 12(h)(3) for lack of subject matter jurisdiction.

To invoke this Court's jurisdiction under Section 1491(b)(1), a protestor must allege a violation "in connection with a procurement or a proposed procurement."[20]  28 U.S.C. § 1491(b)(1).  The phrase "in connection with" is "very sweeping in scope."  *RAMCOR*, 185 F.3d at 1289.  The Federal Circuit has instructed that "the phrase, 'in connection with a procurement or proposed procurement,' by definition involves a connection with any stage of the federal contracting acquisition process, including 'the process for determining a need for property or services.'"  *Distributed Sols.*, 539 F.3d at 1346.  With this in mind, bid protest jurisdiction is proper if "the government at least initiated a procurement, or initiated 'the process for determining a need' for acquisition."  *Id.*  However, Section 1491(b)(1) "does not confer jurisdiction over claims alleging legal violations that only might affect unidentified pending and future procurements."  *Geiler/Schrudde & Zimmerman v. United States*, 743 F. App'x 974, 978 (Fed. Cir. 2018).  Jurisdiction is not proper "whenever a plaintiff alleges a legal violation that might affect

---

[20] As discussed, *CACI* did not overrule Federal Circuit precedent holding that Section 1491(b)(1)'s requirement of an "alleged violation of statute or regulation in connection with a procurement or a proposed procurement" is jurisdictional.  *Supra* note 14; *see also Distributed Sols.*, 539 F.3d at 1344–46; *CACI*, 67 F.4th at 1151 (only overruling "prior caselaw treating the interested party issue as a jurisdictional issue").

unidentified pending or future procurements." *Id.*

Counts II and III of the Second Amended Complaint appear to reach *all* the VA's potential, future procurements of clinical surveillance software. Count II, for instance, alleges that the VA's "procurements of clinical surveillance software generally" are unlawful. 2d Am. Compl. ¶ 51. Count III likewise contends "the VA is required to seek [VOSB or SDVOSB resellers of clinical surveillance software] in *any procurement action*." *Id.* ¶ 65 (emphasis added). In both Counts II and III, Bitscopic alleges the VA is required to set aside clinical surveillance software procurements, "*including*" the VISN 20 procurement, for small businesses and VOSBS or SDVOSBs, respectively. *Id.* ¶¶ 53, 66 (emphasis added). For relief, Bitscopic requests this Court "[d]irect [the] VA to conduct *all* clinical surveillance software and/or service procurements in compliance with statutory and regulatory requirements." *Id.* at 35 (emphasis added). Again, as discussed, Bitscopic is candid that it seeks to prevent the VA from *ever* using TheraDoc. *See, e.g.*, 2d Am. Compl. at 34–35; PI Mot. at 3 ("Bitscopic requests that this Court . . . enjoin the agency from proceeding with any future procurement of TheraDoc software . . . ."); *id.* at 40, 41 ("Any VA procurement of TheraDoc is presumptively illegal . . . ."); Joint Status Report (ECF No. 81) at 4; Plaintiff's Opposition to Motion to Remand (ECF No. 84) at 9.

To the extent Bitscopic asserts Counts II and III against all future, unidentified VA procurements of clinical surveillance software, such allegations simply "might affect unidentified pending or future procurements." *Geiler*, 743 F. App'x at 978. Accordingly, such claims must be dismissed pursuant to Rules 12(b)(1) and 12(h)(3) as this Court lacks subject matter jurisdiction over allegations relating to such future, unidentified clinical surveillance software procurements. *See Geiler*, 743 F. App'x at 978 (affirming dismissal for lack of jurisdiction because the protestor did "not challenge a specific procurement" and therefore "failed to allege a

legal violation in connection with a procurement or proposed procurement").

## **CONCLUSION**

For the foregoing reasons, the Government's Cross-Motion to Dismiss (ECF No. 58) and DSS's Cross-Motion to Dismiss (ECF No. 59) are **GRANTED**. Counts I and IV of Bitscopic's Second Amended Complaint (ECF No. 52) are **DISMISSED AS MOOT** under Rules 12(b)(1) and 12(h)(3). Counts II and III of Bitscopic's Second Amended Complaint (ECF No. 52) are **DISMISSED** under Rule 12(b)(6) and are alternatively **DISMISSED in part** under Rules 12(b)(1) and 12(h)(3), to the extent identified in Discussion Section III of this Court's Memorandum and Order. Accordingly, this action is **DISMISSED**, and the Government's Opposed Motion for Voluntary Remand (ECF No. 82) and Bitscopic's Second Revised Motion for a Preliminary Injunction (ECF No. 53) are **DENIED AS MOOT**.

The parties are directed to **CONFER** and **FILE** a Notice within seven days of this Memorandum and Order, attaching a proposed public version of this Memorandum and Order, with any competition-sensitive or otherwise protected information redacted.

The Clerk of Court is **DIRECTED** to enter Judgment accordingly.


IT IS SO ORDERED.



*Eleni M. Roumel*
ELENI M. ROUMEL
Judge

June 28, 2023
Washington, D.C.